## NEW ENGLAND TRUST CO. v. FARR et al.
### No. 2611.

Circuit Court of Appeals, First Circuit.
March 18, 1932.

John M. Morrison, of Boston, Mass. (Robert N. Daley, Jr., of South Boston, Mass., and Sawyer, Hardy, Stone & Morrison, of Boston, Mass., on the brief), for appellant.

Charles C. Cabot, of Boston, Mass. (Warner, Stackpole, Bradlee & Cabot and Charles F. Albert, all of Boston, Mass., on the brief), for appellees.

Before BINGHAM and WILSON, Circuit Judges, and MORRIS, District Judge.

MORRIS, District Judge.

This is an action of contract, in which the plaintiffs, appellees, hereinafter called the plaintiffs, seek to recover the purchase price of certain stocks alleged to have been bought by the plaintiffs upon orders of the defendant appellant, hereinafter called the defendant.

There was a trial by jury, resulting in a verdict and judgment for the plaintiffs. The case comes to this court on defendant's appeal.

The plaintiffs are nine copartners doing business as Farr & Co., eight of whom are citizens and residents of New York, and the ninth a citizen and resident of New Jersey.

The defendant is a trust company organized under the laws of Massachusetts having a usual place of business in Boston.

The first five counts of the declaration allege breaches of contracts by the defendant to receive and pay for certain named securities ordered by the defendant. The sixth count covers the same transactions set forth in the first five counts, with an account annexed showing the amounts sought to be recovered under each of the preceding five counts.

The answer is a general denial and a plea of ultra vires.

The plaintiffs are a firm of stockbrokers who for many years have been doing a general stock brokerage business in New York. On February 1, 1929, they opened a branch office in Boston under the joint managership of Gilbert L. Stewart and Thomas P. Brooks, neither of whom was a partner in the firm. Among the customers of this office was the defendant, but up to about August 1, 1929, it had executed orders only for the trust department of the defendant. This business was handled on behalf of the defendant chiefly by Frederick O. Morrill, who had been in its employ since 1903, first as messenger, then as assistant treasurer, and finally on June 28, 1929, he was made an assistant vice president,

with the additional duties of credit manager. In the extension of service to its customers, the defendant had been accustomed to receive orders for the purchase and sale of securities, causing the same to be executed through some brokerage house, charging the customers' deposit accounts with the amounts of such purchases or crediting them with the proceeds of such sales. When these orders were given, the name of the customer was not disclosed to the brokers. The transactions were carried through on the defendant's credit. The identity of the particular customer for whom the stocks were purchased would be disclosed only upon payment of the bill rendered by the broker.

The business was handled on behalf of the defendant chiefly by Frederick O. Morrill through Frank S. Palfrey, who was employed by Farr & Co. in their Boston office. Palfrey was what is known as a "customers' man," and his duties were the taking of orders from persons and institutions for the purchase and sale of securities and informing customers concerning the stock market. Previous to August 1, 1929, Palfrey had been employed by Elmer H. Bright & Co., another brokerage house doing business in Boston, as a "customers' man," and while there did much business with the defendant, handled chiefly by Morrill, although other officers of the trust company from time to time had orders executed through Palfrey.

After Palfrey became connected with the plaintiffs' organization, the defendant through Morrill gave the plaintiffs, chiefly through Palfrey, many orders for the purchase and sale of securities in the name and on the credit of the trust company. It is alleged that these transactions, between August and October, 1929, numbered approximately three hundred. All of these orders were duly executed by the plaintiffs and payment made by them to the persons from whom they bought on the various stock exchanges. All of these purchases, with the exception of six, were duly taken up and paid for by the defendant. Of the six orders which were not paid for, five were purchases of stock, when, as, and if such stock was issued by the corporations. It is these six purchases which are the ones in suit, and a list of them, with the order dates and settlement dates, follows:

| Date of Order | Amount | Name | Basis | Settlement Date |
|---|---|---|---|---|
| 7/30/29 | 100 | United Gas Improvement | When issued | 9/26/29 |
| 7/30/29 | 100 | United Gas Improvement | When issued | 9/26/29 |
| 9/27/29 | 100 | Commercial Solvents | When issued | 10/21/29 |
| 9/30/29 | 2000 rts. | United Gas Improvement | When issued | 12/ 4/29 |
| 10/ 1/29 | 100 | Stone & Webster | Already issued | 10/ 1/29 |
| 10/19/29 | 2000 rts. | United Gas Improvement | When issued | 12/ 4/29 |

In all of the above cases the plaintiffs, according to their custom, sent slips to the trust company on the day of receiving the orders confirming the receipt and execution of the same, and on the settlement dates, after payment by them, sent further slips showing the indebtedness of the trust company to them on account of each order.

On October 30, 1929, the plaintiffs' Boston office received a letter from Messrs. Tyler, Eames, Wright & Hooper, attorneys for the defendant in this matter, in which it was stated that the six purchases above listed "were entirely unauthorized" by the defendant, and that it disavowed "all such unauthorized purchases" and disclaimed "all responsibility in connection therewith."

Thereafter, on December 5, 1929, the plaintiffs sold the securities and brought this action to recover the difference between the amount for which they had purchased the securities and the amount received by them upon their sale.

The defendant by its answer denies that it made or authorized such purchases, and, further answering, says that the transactions in question were wholly and entirely ultra vires the said trust company, and that it is therefore in no way responsible for them.

It alleges that the purchases in issue were made by Morrill without actual authority from the defendant, and were for his own benefit; that Palfrey knew, or should have known, of Morrill's lack of authority to make the purchases; that Palfrey's knowledge was to be imputed to the plaintiffs; that the plaintiffs were thereupon put upon inquiry as to Morrill's actual authority to make each particular purchase; and, inasmuch as all of the purchases in issue were in fact for Morrill's own account, and not for the trust company or a customer, that the plaintiffs were barred from recovery.

The evidence establishes that Frederick O. Morrill was assistant vice president and assistant treasurer of the New England Trust Company, and vested with authority to purchase stock in the name of the trust company whenever it became desirable to purchase shares for a customer; that the orders usually were placed by Morrill through Palfrey with Farr & Co.

All of the transactions in question, between Morrill and Farr & Co., were executed through Palfrey.

The defendant has assigned forty-four alleged errors. The first fifteen relate to rulings on evidence. The next twenty-two assignments are based on the refusal of the trial court to given certain rulings requested by the defendant. The last seven embody defendant's objections and exceptions to the charge of the trial court.

The defendant contends that Morrill, by reason of his position as an officer of the defendant, was able to place with the plaintiffs various orders for the purchase of stock in the name of the New England Trust Company, which were in reality for his own benefit and made in his own behalf; no customer of the defendant being in any way involved. The evidence tends to show that in each case, following receipt of the order to purchase the stock in question, confirmation slips, so called, would be sent out and addressed in all instances to "New England Trust Company, Attention: Mr. Morrill, 135 Devonshire Street, Boston"; that Morrill would place this mail on his desk, and it would be opened by him; that, in addition to his market speculations, Morrill engaged in the purchase and sale of securities on margin accounts conducted in his own name with the plaintiffs as well as with other brokers; that during the period of the sharply rising stock market in the summer of 1929 Morrill gave to the plaintiffs a number of orders which were not for the trust company or any of its customers; that these orders were given in the name of the trust company, as it was Morrill's desire to create the impression with Farr & Co. that the orders given by him in the name of the New England Trust Company, which were in reality for his own benefit, were for the New England Trust Company; that, when a security had been bought and held by Farr & Co. for a short time, Morrill would order it sold and a check for the profit sent to the trust company, "Attention: Mr. Morrill." The evidence also tends to show that Morrill would intercept these checks and statements when they arrived at the bank before they were seen by any one else, and the checks would be cashed by the tellers and the proceeds given to Morrill.

Morrill testified, as to all of the securities in issue except the Commercial Solvents and one block of 2000 United Gas Improvement rights, that he told Palfrey at the time of giving the orders that they were in reality for his own account. He testified that almost immediately upon Palfrey's association with the plaintiffs he (Morrill) placed through Palfrey's agency an order with Farr & Co. for the purchase of 100 shares of U. G. I. stock (United Gas Improvement), when, as, and if issued. The order was dated July 30, 1929.

Morrill testified that at the time of the order in question he and Palfrey had a conversation in which Palfrey was informed that the stock was being purchased for his own benefit because of his personal opinion as to its investment value; "that there was a lot of good talk on it, and it apparently was headed for much higher prices. * * * It would give him [Palfrey] an order and get him started with his new firm and show he was getting some business from us"; that this talk was one day after Palfrey's connection with Farr & Co.; that at the time he had no account with Farr & Co.; that at the time of his talk with Palfrey he mentioned to Palfrey that he had some of the same stock with Bright & Co., with whom Palfrey was formerly connected, mentioning that he had 100 shares with Bright & Co., and that he might as well have another 100 shares with Farr & Co.; that the 100 shares with Bright & Co. had been purchased through Palfrey; that the U. G. I. stock in question was selling on a when issued basis as distinguished from a stock that had already been issued; that no account was opened in his own name on Farr & Co.'s books at the time of this purchase since the U. G. I. was bought in the name of the New England Trust Company; that on or about August 31, 1929, an order to purchase an additional 100 shares U. G. I. when issued was placed by Morrill with the plaintiffs through Palfrey; and that again Morrill talked with Palfrey with regard to his purchase, saying, in substance, that he "thought well of the stock and thought he might as well have another 100 shares of it."

This purchase was charged to the New England Trust Company. The next item purchased by Morrill for his own account was ten shares of Edison Electric, August 2, 1929. This was the day before the second purchase of U. G. I. The Edison Electric was purchased in the name of the New England Trust Company. At the time of these transactions Morrill had no personal account with the plaintiffs, but such an account was opened as of August 15, 1929, by Morrill's making a deposit of $500. Morrill testified that he had some discussion with Mr. Palfrey and also Mr. Brooks, one of the general managers of the Boston Office of Farr & Co., in connection with a transfer of the Edison stock from the account of the trust company to his own account; that this talk took place August 26, 1929; that he told Brooks that he had bought these 10 shares of Edison in the name of the bank for his own account; that he had paid considerably more for it than he thought he was going to pay for it at the time of buying,

as he understood the price was considerably less than the price paid; that he had been stringing it along on the account anticipating transferring his personal account from Bright & Co. over to Farr & Co.; that circumstances did not seem to be such that he could transfer the Bright & Co. account, so he would like to have an account opened in his own name in Farr & Co.'s books, and asked him if $500 would be enough to open an account and transfer the Edison stock from the bank's account to his own account.

Morrill further testified that the Edison stock which was transferred to his own personal account was sold on October 5, 1929, at about $360 per share, he (Morrill) taking the loss; that the next transaction was the purchase of a 100 shares of Warren Bros. on August 14 at 169¾, purchased for his own account in the name of the bank; that this stock was later sold on August 22d at 182, showing a profit; that on or about August 23d he received a check for the profit, the amount being something in excess of $1,100, the final amount being $1,142.67; that the check came into his possession at the New England Trust Company by messenger, and was applied by him to his indebtedness to the New England Trust Company, being applied with additional funds so as to make the total amount applied $1,450; that on or about August 26 he purchased through Palfrey in the name of the New England Trust Company 100 shares of Warren Bros. at 190; that the stock was later, about August 29, transferred from the New England Trust Company account to his own personal account, as indicated by Farr & Co.'s books.

Morrill testified that again he had talk with Palfrey relative to this transfer, at which time he told Palfrey that he had 100 shares of Warren Bros. in the bank's account which he had bought himself, and asked him if he did not think he had better get it out of the bank's account and transfer it to his own account, stating that the bank might be sent a statement, and it might be quite difficult explaining it. Morrill testified that Palfrey told him that he was not acquainted with their methods and did not know what their custom was as to sending out statements, and he (Palfrey) thought it would be better not to have any question about it, and advised Morrill to put it in his own account.

It appeared in the testimony that the Warren Bros. stock was eventually sold on October 3, 1929, out of Morrill's personal account at $195 per share, minus commissions and taxes. Following these transactions, 100

shares of Johns Manville stock and 1,000 shares of Consolidated Gas rights were purchased by Morrill for himself in the name of the New England Trust Company, and were sold within a short time after their purchase in the name of the New England Trust Company at a profit of $1,648. Morrill testified that the check was delivered to him at the bank by a messenger, and upon receipt of it he cashed it, giving the cash to Farr & Co. as a part of $2,000 which he deposited with them to his margin account; that the next item that was for his own account purchased in the name of the New England Trust Company was September 27, 1929, when a purchase was made of 100 shares of Commercial Solvents, new, when issued. This order was placed through Palfrey.

The next transaction in the name of the New England Trust Company, but in reality for his own account, was September 30, 1929, when he purchased 2000 U. G. I. rights on a when issued basis. He testified that his recollection was that he gave the order to Steward rather than to Palfrey, although he was not certain about it. He said he had very little contact with Steward between July 30, 1929, and October, 1929. On October 1 he bought 100 shares of Stone & Webster through Palfrey in the name of the New England Trust Company. The last purchase in issue in this case was made October 19, 1929, when Morrill placed an order with Palfrey for 2000 rights of U. G. I. stock when issued.

The record is replete with testimony of other transactions in the name of the New England Trust Company, which were for Morrill's own benefit not really in issue in this case; they having been closed before Morrill's transactions were discovered by the trust company. The record also discloses that there were something like three hundred transactions legitimate and illegitimate, about twenty-five of the latter class between Morrill acting in the name of the bank and Farr & Co. acting through Palfrey. Of the three hundred transactions only six of them are in issue.

It follows from the foregoing excerpts from the testimony of Morrill, if believed, that Palfrey was fully informed that Morrill was purchasing stocks and rights for his own account in the name of the New England Trust Company. The plaintiff denied having such knowledge either actual or constructive.

There are forty-four assignments of error, and it seems very appropriate to refer to the criticism of the Supreme Court on this subject in the case of Phillips v. Seymour,

91 U. S. 646, 648, 23 L. Ed. 341, wherein Mr. Justice Miller says:

"The object of the rule requiring an assignment of errors is to enable the court and opposing counsel to see on what points the plaintiff's counsel intend to ask a reversal of the judgment, and to limit the discussion to those points. This practice of unlimited assignments is a perversion of the rule, defeating all its purposes, bewildering the counsel of the other side, and leaving the court to gather from a brief, often as prolix as the assignments of error, which of the latter are really relied on."

Such an interminable number of assignments place a burden upon the court. We will try to respond to such points made by counsel as seem to be material to the issues which we must decide. In view of this, we have made a grouping of such as properly may be considered together.

The issues in this case may be generally classified, first, as to the extent of knowledge acquired by the different agents of the plaintiffs concerning the real nature of Morrill's transactions; and, secondly, as to the extent to which such knowledge is to be imputed to the plaintiffs.

Various phases of these general issues are presented in the assignments of errors set forth below.

The defendants waived any claim advanced in its behalf under the assignments of errors respectively numbered 1, 2, 6, 25, 26, 27, 32, 33, 34, 37, 38 and 39.

Assignments of errors numbered 3, 4, and 5 are as follows:

"3. The court erred in allowing the witness Gilbert Steward in giving testimony concerning one F. B. Lothrop, an employee of the defendant, to answer the question:

"'Q. Do you know whether or not he is an officer of the New England Trust Company?' The answer being: 'Yes.'

"4. The court erred in allowing the witness Gilbert Steward in giving testimony concerning one F. B. Lothrop, an employee of the defendant, to answer the question:

"'Q. Is he an officer in the New England Trust Company?' The answer being: 'Yes.'

"5. The court erred in allowing the witness Gilbert Steward to give the substance of a conversation occurring between said Steward and one F. B. Lothrop, an employee of the defendant company, which testimony is set out in detail in the defendant's bill of exceptions."

As these assignments all relate to the same general considerations, we will treat them as a unit.

The substance of the evidence to which objection was made is that Steward testified that F. B. Lothrop was an officer of the trust company. In this he appears to have been mistaken, as Roger Pierce, president of the trust company, was later recalled and testified that Lothrop was employed by the New England Trust Company as assistant to the president, but that he would not consider that he was an officer, and that his duties were such as the title might suggest; namely, to assist and be helpful to the president in whatever way he could. We think the correction of Steward's testimony with reference to Lothrop's connection with the bank was so definitely made plain when Pierce was recalled that the jury could not have been misled by Steward's testimony. Furthermore, the only conversation which was the subject of error No. 5 is contained in the following questions and answers:

"Q. State the conversation.

"A. Called attention to New England Trust Company's account.

"Q. Where was the conversation?

"A. It was in my office. He had come to see me. I said it was time they paid. We were sick of using our own money and our own collateral to carry their stock. He was very surprised indeed that they hadn't paid."

Apparently Lothrop, in his capacity as an employee of the trust company, had gone to Farr & Co.'s office in connection with these or some other transactions between the trust company and the plaintiffs.

Steward might well let it be known that the trust company's account was overdue, believing that Lothrop's position as assistant to the president made him a proper person to whom such notice could be properly given, and nowhere does it appear that such was not the fact.

We see no reversible error in the admission of this testimony.

Assignments of error Nos. 7, 8, 9, 10, and 11 are not herein completely set out because of the detail covered by them. They relate to various offers of proof made by the defendant with regard to testimony which the defendant expected to adduce from one John F. Barry, a member of the firm of Elmer H. Bright & Co., by which Frank S. Palfrey was employed from March 1, 1929, to August 1, 1929, as a "customer's man." It appeared from Barry's testimony that prior to March 1, Palfrey had been employed as a "customers' man" by Clement, Parker & Co. with which the witness had been connected.

The defendant offered to show that prior to March 1, 1929, Palfrey had made purchases under the direction of Morrill in the name of the New England Trust Company, which were speculative purchases so far as Morrill was concerned, and that at the request of Palfrey certain shares of stock were transferred from the account of the New England Trust Company to the personal account of Morrill upon the books of Clement, Parker & Co.

The defendant further offered to show similar transactions between Elmer Bright & Co. and the New England Trust Company handled by Morrill through Palfrey and that stocks charged to the Trust Company were afterwards transferred to Morrill's account, sold at a loss, and the deficit made up by Morrill. The defendant further offered to show that prior to July 31, 1929, no monthly statements were sent to the New England Trust Company by Elmer H. Bright & Co. All these offers were rejected by the court.

The witness Barry was permitted to testify that there were transactions between Elmer H. Bright & Co. and the New England Trust Company on orders given by Morrill assumably put in by Palfrey, but the witness had no evidence and no personal knowledge to show that they were, as the records of Bright & Co. were not available to him at the time he was testifying. He further testified that Morrill had a personal account with Elmer H. Bright & Co. from March through August, 1929, and that the New England Trust Company also had an account from March 1 to July 1, 1929; and that in March, 1929, the New England Trust Company had an account with Clement, Parker & Co., as also did Morrill.

Later, in the progress of the trial, Morrill was permitted to testify without objection or exception "that he had previously made purchases for his own account and benefit in the name of the New England Trust Company through Palfrey while the latter was connected with Clement, Parker & Co. during 1929; that transfers had been made from the New England Trust Company account with Clement, Parker & Co. to his own personal account of stocks bought in the name of the New England Trust Company, but really for his own benefit, purchases being made through Palfrey; that all of the transfers thus made were at a loss which was assumed and borne by him; that transfers were also made of stock purchased in the name of the New Eng-

land Trust Company through Palfrey, which were in reality purchased for his own benefit and profit upon the New England Trust Company's account to his own personal account with Elmer H. Bright & Co. during 1929; that the transfers thus made also showed a loss and were all consummated prior to Palfrey's association with Farr & Co.; that Palfrey knew of these transfers, knowing that the transactions had resulted in a loss which he, Morrill, was to bear."

The defendant relies on the case of The Distilled Spirits, 11 Wall. 356, 20 L. Ed. 167, wherein it is said the rule that notice to the agent is notice to the principal applies not only to knowledge acquired by the agent in the particular transaction, but to knowledge acquired by him in a prior transaction and present in his mind at the time he is acting as such agent, provided it be of such a character as he may communicate to his principal without breach of professional confidence.

This rule can apply only to actual knowledge of an agent as distinguished from constructive knowledge. Prior constructive knowledge could not be present in the mind of an agent when acting for another principal, and hence could not be imputed to such principal.

The offers of proof in this case relate to prior transactions between Morrill and Clement, Parker & Co., and Elmer H. Bright & Co., each of the latter companies acting through Palfrey, who was employed by them as a "customer's man."

A "customer's man" is one whose duties appear to be confined to the soliciting of customers for his employer; to receive the orders of such customers for the purchase and sale of stocks; and to place them with his superiors for execution. He would have no duty or authority to act as the representative of the firm in making discretionary trades for the benefit of customers, and it is quite questionable whether the ethics of the trade would permit him to disclose to his new principal transactions entered into between some prior employer and customers who were doing business with or through such employer; but, be that as it may, it is conceded that the general rule is that any evidence is admissible which has a reasonable tendency to establish a material fact in controversy, provided the evidence is not of a hearsay character or otherwise incompetent. Home Insurance Co. v. Weide, 11 Wall. 438, 440, 20 L. Ed. 197. "If testimony is relevant to an issue, it is generally admissible, and the courts will not ordinarily consider its weight, but will leave that question to be determined by the jury. This general rule, however, is subject to the important qualification that testimony which does have some tendency to establish a material fact may be rejected by a trial judge, and should be rejected, when its admission will have a tendency to divert the attention of the jury from the precise issues involved in the case, and protract the trial beyond reasonable limits. This limitation of the general rule requiring all relevant testimony to be admitted, to which we have last alluded, is not only reasonable in itself, but it is well supported by the authorities. Schradsky v. Stimson, 76 F. 730, 22 C. C. A. 515; Wentworth v. Smith, 44 N. H. 419 [82 Am. Dec. 228]; Lincoln v. Mfg. Co., 9 Allen [Mass.] 181, 187; Phillips v. Town of Willow, 70 Wis. 6, 34 N. W. 731 [5 Am. St. Rep. 114]; Parker v. Publishing Co., 69 Me. 173 [31 Am. Rep. 262]; Thompson v. Bowie, 4 Wall. 463, 471 [18 L. Ed. 423]; 1 Greenl. Ev. § 62, and cases there cited." Golden Reward Mining Co. v. Buxton Mining Co. (C. C. A.) 97 F. 413, 416.

It is always a question within the discretion of the trial judge as to how far parties may be permitted to go into collateral issues; such discretion being exercised by a fair consideration whether the evidence is relevant to the issue, its probable effect upon the jury, the likelihood of confusing the issues, and the probable time that will be consumed if such collateral issues are followed to their legitimate ends.

In view of the fact that the court permitted Barry to testify to transactions between Clement, Parker & Co. and Elmer H. Bright & Co. with the defendant trust company, which transactions were carried out through orders of Morrill *assumably given by Palfrey,* we do not think the trial court abused its discretion in excluding the offered testimony, especially in view of the fact that the witness disclaimed any personal knowledge that the orders were in fact given through Palfrey. Morrill, who was supposed to have first-hand information, testified fully as to the matters.

Assignments numbered 12, 13, 14, and 15 relate to the same subject-matter, namely, the exclusion of a certified copy of the death certificate of Frank S. Palfrey, which was offered either as a whole or in part with the words, "suicide by shooting," and "unsound mind," deleted from the certificate.

Massachusetts Gen. Laws, c. 46, § 19,

makes the record of a town clerk relative to birth, marriage, or death prima facie evidence of the facts recorded, and provides that a certificate thereof signed by the town clerk or assistant clerk shall be admissible as evidence for that purpose.

Apparently defendant's offer of the death certificate was for the purpose of informing the jury that Palfrey committed suicide, as it appeared in the evidence of a witness who attended his funeral that he was dead at the time of the trial. The only purpose would seem to be to create an impression that Palfrey had been engaged in some fraudulent scheme in his connection with Farr & Co., which preyed upon his mind to such an extent that he chose suicide rather than face the facts. The death certificate was admissible under the Massachusetts statute to show such facts as are required by statute to be reported, but we are convinced that the defendants were not harmed by the exclusion of this evidence, and that in fact they were most likely benefited thereby, as its logical tendency was to establish just what we believe the jury found, viz. collusion between Morrill and Palfrey. The rule with reference to the introduction of such testimony has been stated as follows: "Though a document contains matter relevant, and so prima facie admissible, yet, if these matters are of little evidential value, and inseparably mingled with matters inadmissible and highly prejudicial, the materiality is merged in the prejudice, and the document cannot be received." Harrison v. United States (C. C. A.) 200 F. 662, 663.

It was not prejudicial error to exclude the offered certificate.

■ Assignment of error numbered "16" is founded upon request numbered "2" in defendant's request to charge, as follows:

"That where the agent has knowledge of a fraud or fraudulent acts relating to the transaction in which the agent is acting in behalf of its principal, the knowledge of the agent is to be imputed to the principal, unless the agent is committing an independent fraud on his own account and for his own benefit. National Security Bank v. Cushman, 121 Mass. 490; Loring v. Brodie, 134 Mass. 453 at page 468."

This request to charge appears to have been fully considered and covered as appears from the following excerpt: The court charged: "It is 'a general rule of agency applicable both to corporations and to natural persons, that notice to an agent, while acting within the scope of his employment for his principal, of facts affecting the character

of the transaction in which he is engaged is constructive notice to the principal.' "

The court then commented upon the reasons for the rule, and then stated the exceptions to it in the following language: "If the circumstances were such that the agent would have a strong urge to withhold the information from his principal so that the presumption that he would communicate it is, clearly overcome, or if the agent were engaged in some *independent fraudulent scheme of his own*, and is not engaged upon his principal's business, or if in the communication the information the circumstances were such that the communication of the information would defeat or end the fraudulent scheme in which the agent himself was interested, then this presumption of regularity, or the presumption that an agent will do what he ought to do, is overcome, and the knowledge is not imputed or carried over to his principal." (Italics supplied.)

The foregoing is a clear and correct statement of the rule and the exception thereto in language such as the jury would understand. Interstate National Bank v. Yates Center National Bank (C. C. A.) 245 F. 294; McDermott v. Hayes (C. C. A.) 197 F. 129, 135; Ohio Millers' Mut. Ins. Co. v. Artesia State Bank (C. C. A.) 39 F.(2d) 400.

Assignments 17, 18, 19, 20:

Assignment 17, based upon request No. 3, is as follows:

"That if the jury find that Palfrey knew or should have known that Morrill was dealing in the bank's name but in reality for his own account and for his own benefit, then such knowledge is imputed to the plaintiffs."

■ No. 18, based on request No. 4, relates to the knowledge of Steward. No. 19, based on request No. 5, relates to the knowledge of Brooks. No. 20, based on request No. 6, relates to the knowledge of Ulmer. These four assignments may properly be considered under the same heading. It will be remembered that Steward and Brooks were the men in charge of plaintiff's Boston office. Ulmer was a bookkeeper in the office. .

The court, after calling the jury's attention to the fact that it was claimed by the plaintiff that none of their representatives in Boston had knowledge or reasonable grounds to believe that Morrill was purchasing these securities for his own account, and further calling attention to the defendant's contention that, if the plaintiffs' agents had knowledge that Morrill was dealing on his

own account in the name of the trust company, such knowledge must be imputed to the plaintiffs as a matter of law and bar plaintiffs' recovery, then charged as follows:

"Now, if the contention of the defendant is one which has been proven to your satisfaction by evidence before you, then the defendant Trust Company is entitled to a verdict at your hands. Thus you see that the issue as drawn is a comparatively narrow one. It relates largely to the knowledge; it relates, I think I could say almost fully, to the knowledge which the Boston representatives of the brokerage firm, the plaintiff firm, had respecting the real nature and character of the transactions which Morrill entered into in the name of the company and for his own benefit."

It thus appears that the court's charge was not confined to the knowledge which Palfrey may have acquired, but he also included Steward, Brooks, and Ulmer, the other agents of the plaintiffs operating in the Boston office.

Assignments 21, 23, 24, and 29:

Assignment 21, founded upon plaintiffs' request numbered 7, is as follows:

"That if the jury find that Palfrey from the books and records of the plaintiffs had or should have had notice of the fact that Morrill was speculating on the market in the name of the bank but in reality for his own benefit, then such notice is to be imputed to the plaintiffs."

Assignment numbered 22, based on request numbered 8, assignment numbered 23, based on request numbered 9, and assignment numbered 24, based on request numbered 10, relate to the knowledge of Steward, Brooks, and Ulmer, respectively, gained from the books and records, and are stated in practically the same language as assignment numbered 21 relating to Palfrey. Assignment numbered 29, based on request 17, is comprehensive and takes in all of plaintiffs' agents.

█ Although the above-mentioned requests were not given in the language of defendant's counsel, yet, as above pointed out, the court in general terms charged that, if the jury found that any of the plaintiffs' agents connected with the Boston office had knowledge of Morrill's fraudulent dealings, such knowledge would be imputed to the plaintiffs.

█ It is not necessary that requests, if correct, be given in terms if given in substance. American Sugar Refining Co. v.

Nassif (C. C. A.) 45 F.(2d) 321, 325. Further, the court is not required to apply the general provisions of its charge to particular portions of the testimony, unless such testimony relates to an admitted or established fact in the evidence.

█ It was the evident purpose of counsel in framing these requests to obtain from the court a charge making knowledge obtained from plaintiffs' books determinative of the case. Such requests were properly denied. There was other evidence, pro and con, on the question, and there were other issues in the case for the consideration of the jury. The evidence obtained from the books was not conclusive; therefore it would not have been proper to so charge that the entire case would turn upon a single piece of evidence. Piper v. Railroad, 75 N. H. 228, 235, 72 A. 1024; Walker v. Railroad, 71 N. H. 271, 51 A. 918; Rublee v. Belmont, 62 N. H. 365; Tonsman v. Greenglass, 248 Mass. 275, 279, 142 N. E. 756.

Assignments 28, 35, and 36:

Assignment 28, based upon request 16, is as follows:

"That if the plaintiffs or any of their agents had actual knowledge or notice that Morrill had accomplished one or more transactions in the name of the New England Trust Company but actually for his own benefit and in his own behalf, they cannot as a matter of law be permitted to overlook other similar transactions but are put upon inquiry as to all such transactions."

Assignment 35, based upon request 26, relates to Palfrey's knowledge, and is so nearly like 28 as to be properly classed with it. The same may be said of 36, based on request 37, which relates to Palfrey's knowledge respecting one or more transactions.

█ We think these requests were covered sufficiently in the charge. The knowledge acquired as to any one fraudulent transaction would be of the same character as that acquired from any other. While the court did not specifically charge as requested, it did charge that, if plaintiffs' agents knew that Morrill was buying stock for his own account in the name of the trust company, the plaintiffs could not recover, at the same time cautioning the jury to construe what he had just said with what he had previously said "regarding the doctrine of agent and principal and the exception to the rule." The charge was not limited to one or two or more transactions. It was applicable to all trans-

actions subsequent to that concerning which such knowledge was acquired.

Assignments numbered 30 and 31, based on requests 19 and 20, called upon the court to charge that, if the plaintiffs were put upon inquiry by facts which came to their knowledge, they were bound by constructive notice of what they would have learned had they made inquiry.

Upon this point the judge used the following language:

"I want to amplify that by saying that they (bank) would be liable unless the plaintiffs knew or had reasonable grounds to believe that these were unlawful and unauthorized transactions and you will bear that in mind, and remember whenever I have used the expression in the course of my charge 'knowledge of the plaintiff,' I have meant to include not only actual knowledge, but the facts and circumstances which would create or generate a reasonable belief that the acts were unauthorized or unlawful."

Further, the court charged that, "if the plaintiffs were put upon the duty of inquiring into the legitimacy of the transactions in which Morrill was engaged in, they ought to be bound by whatever knowledge or whatever facts such inquiry would have revealed."

We think the charge in this respect plainly called the jury's attention in apt language to the effect of constructive notice.

Assignments of errors numbered 40, 42, 43, and 44 embody defendant's objections to the charge of the court, and relate to notice that may be imputed to the plaintiffs. Defendant objected and excepted to the language of the court wherein it explained to the jury that, if an agent had a strong urge to withhold his information from his principal, his knowledge would not be imputed, and also to the fact that the court explained to the jury the reasons for the exceptions to the general rule.

We find no error in the court's charge with respect to these assignments.

The jury returned a verdict for the plaintiff. We think it a fair statement to say that, in order to arrive at such a result, the jury must have found either that Morrill's testimony was entirely unreliable, and that plaintiffs' agents had no notice, either actual or constructive, that Morrill's transactions were fraudulent and unauthorized, or that Morrill and Palfrey were so far in collusion that Palfrey's interest was adverse to his employers', in which case the jury applied the court's charge that under such circumstances Palfrey's knowledge would not be imputed to Farr & Co.

The chief testimony relied on to show knowledge by Palfrey was that of Morrill himself. Palfrey was not alive to contradict Morrill. Morrill's testimony contains many inconsistencies. Moreover, he testified that, when he told Palfrey that he (Palfrey) would be involved, Palfrey said he did not know anything about it. Morrill also admitted having made statements within a few days after his confession to the bank that Palfrey did not know anything about these transactions or that they were entered into for his own account. He also testified that he had changed his story after Palfrey's death and that he naturally gave some consideration to the fact that, if he changed his story so that it would help the New England Trust Company, it might result in saving him from criminal prosecution. Obviously a jury would give little credit to Morrill's testimony after hearing such admissions.

Further touching the question of collusion between Palfrey and Morrill, it appeared that, when the stock market crashed, and Morrill knew he was so heavily involved that he could not extricate himself from his financial difficulties, he went to Pierce, president of the New England Trust Company, and confessed to his unauthorized transactions carried on in the name of the trust company. This confession was made at Pierce's residence the evening of October 28, 1929.

On November 11, Armistice Day, he made an appointment with Palfrey to meet him at the office of Farr & Co. Morrill testified to what occurred at this meeting as follows:

"I said to Palfrey: 'Frank, they are going to get you into this thing before it is over with.' He said: 'Why, I don't know anything about it. They can't get me into it.' I said: 'You certainly did know about some of the transactions, especially the Stone & Webster transaction.' And we talked for awhile about the various transactions and then we went over to a desk and sat down and figured up the market value at that time of the various items and found out that there was a difference in the market value then and at the time they were purchased of something in excess of $20,000 and Mr. Palfrey suggested to me that he sell all of these items in the Farr account the next morning and make up that loss himself by borrowing the money from some friends of his. I told him that might be all right as far as the Farr account was concerned, but there was

still the Bright account and there were some items on that that he was familiar with and knew about and that it could not help a great deal to clean up the Farr account and not clean up the Bright account. He then thought awhile and said: 'Let me have a few days to think this over. There isn't any hurry about it, is there?' I said: 'No, there is no special hurry. I think it ought to be taken care of as soon as possible for there is no telling what may happen.' And that is the way I left it with him at that time."

Palfrey's death occurred November 14, 1929. If this testimony of Morrill is deserving of credit, it plainly shows that Palfrey was interested in Morrill's transactions for his own benefit and that he was in collusion with Morrill.

We are cognizant of the fact that a different result was reached in the case of New England Trust Co. v. Elmer H. Bright et al. (Mass.) 174 N. E. 469, 73 A. L. R. 416, but it was the province of the jury, not ours, to settle all questions of fact. Whether they found collusion between Morrill and Palfrey, or whether they found that plaintiffs' Boston agents had no knowledge, actual or constructive, of the character of Morrill's transaction, is not disclosed. There was evidence to support either conclusion.

The charge of the court was clear and ample on these two important issues. We find that the trial was not rendered unfair by the introduction or exclusion of evidence or by the failure of the court to give the requests of the defendant's counsel.

The judgment of the District Court is affirmed, with interest, the plaintiffs, appellees, to recover their costs.