CARSTAIRS et al. v. AMERICAN BONDING & TRUST CO. OF BALTI-
MORE CITY.

(Circuit Court of Appeals, Third Circuit. June 5, 1902.)

No. 12.

1. FIDELITY INSURANCE—CONSTRUCTION OF CONTRACT—MISSTATEMENTS BY EM-
PLOYER.

A fidelity bond issued to an employer to indemnify it against loss
through any defalcation of its manager provided that certain statements
made by the employer relative to the duties and accounts of the em-
ployed, "together with any statements or declarations hereafter required
by, or lodged with, the company, do and shall constitute an essential
part and form the basis of this contract." It further provided that
"any material misstatement or suppression of fact by the employer in
any statement or declaration to the company" should render the bond
void. On the occasion of an annual renewal of the bond, the treasurer
of the employer, on its behalf, made a certificate to the company in
which he stated that on December 23d the books and accounts of the
employed "were examined by us, and we found them correct in every
respect, and all moneys handled by him accounted for, to the best of
our knowledge and belief." The funds of the employer were kept in
bank, from which they were drawn only on checks signed by the man-
ager; and he drew such checks in payment of his own salary. A book-
keeper was employed, who made out monthly statements of account,
which were submitted to the managing board; but such statements gen-
erally purported to show only current receipts and disbursements, and
did not show the condition of the bank account or of the manager's. In
fact, at the time the certificate was made to the bonding company, no
examination of the manager's account had been made since the annual
examination in the preceding February, and on December 23d he had
drawn out, for his own use, $3,700 in excess of his salary, which sums
had been debited to his account by the bookkeeper. During the ensuing
year he became a defaulter for a large amount. *Held*, that the certif-
icate of the treasurer was a material misstatement of fact, which, by
the plain terms of the contract, rendered the bond void.

2. TRIAL—PROVINCE OF COURT—RESERVED QUESTION OF LAW.

Under the Pennsylvania practice, a reservation of "the question
whether there is any evidence to go to the jury in support of the plain-
tiff's claim" is a good reservation of a question of law; and the enter-
ing of judgment for defendant on such reserved point, notwithstand-
ing a verdict for plaintiff, is within the province of the court, being
practically equivalent to the direction of a verdict.

Acheson, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern
District of Pennsylvania.

Joseph DeF. Junkin, for plaintiffs in error.

F. P. Bracken, for defendant in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. In 1895, The Bourse Restaurant Com-
pany, Limited, a limited partnership formed under the Pennsylvania
statute, leased certain rooms and some other property from the
Bourse Company, for the purpose of conducting a restaurant. One
Carl G. Essner was employed by them as a general manager of their
restaurant business. A few months after the restaurant had been
opened, it was discovered that a license, under the Pennsylvania law,

116 F.—29

to sell liquors, could not be taken out by a corporation, and an arrangement was made by which Essner became the licensee, an agreement being made with him in the form of a lease of the premises, by which he was to render a rent amounting to $20,000 per annum, and was to be paid $3,500 for his services as manager. In November of the following year, an agreement was entered into, which made certain provisions with reference to how the rent should be paid, and that certain deductions might be made if the profits of the business were not sufficient to pay it. There was other evidence resting upon the testimony of witnesses and upon the course of business, tending to show that, though the relation between the restaurant company and assignor was in form that of lessor and lessee, yet in reality it was only a form, and he continued as their manager, handling all receipts and making all disbursements and rendering monthly accounts of the profits generally under the name of rent, the lease having been made merely to avoid the disability imposed by the Pennsylvania statute in regard to licenses upon the restaurant company.

On the 23d of December, 1895, upon the application of the restaurant company, the American Bonding & Trust Company, defendant in error, issued to it what is called a "fidelity bond," in which, for the premium named, it covenanted, for the space of one year, to make good to the restaurant company, as employer, any pecuniary loss, to the extent of $5,000, by reason of fraudulent or dishonest acts of Carl G. Essner, as the employed, in connection with the duties of his position, and which should amount to embezzlement or larceny committed during said term. Among the stipulations contained in this bond, are the following:

"Whereas, the employed has been appointed general manager in the service of the employer, and has applied to the company for the grant of this bond. And whereas the employer has delivered to the company certain statements and declarations relative to the duties and accounts of the employed, the manner of conducting the business of the employer, and other matters, which, together with any statements or declarations hereafter required by or lodged with the company, do and shall constitute an essential part and form the basis of this contract. * * * (6) That the company shall not be liable for any loss occurring after the discovery of any fraud or dishonesty on the part of the employed unless the company shall in writing indorsed on this bond formally consent to a continuance of the bond notwithstanding such fraud or dishonesty. * * * (9) That any material misstatement or suppression of fact by the employer in any statement or declaration to the company, or in any claim made under this bond, or in any failure of the employer to perform any of the provisions or conditions herein contained, shall render this bond void from the beginning."

Annual renewals of this bond were made after 1895, the last renewal continuing the policy from December, 1899, to December, 1900. The principal defalcations of Essner took place between February 9, and May 12, 1900. In December, 1899, the defendant in error notified the restaurant company that the period for which the bond was issued was about to expire, and inclosed the usual certificate to be executed by the company as a condition precedent to continuing the contract. This certificate, which was duly signed and delivered to the defendant in behalf of the restaurant company, before the last renewal was issued, is as follows:

"To American Bonding and Trust Company of Baltimore City: This is to certify, that on the 23d day of December, 1899, the books and account of Mr. O. G. Essner, in our employ as ———— were examined by us, and we found them correct in every respect, and all moneys handled by him accounted for, to the best of our knowledge and belief. He has performed his duties in an acceptable and satisfactory manner. We know of nothing in his habits or antecedents affecting unfavorably his title to confidence, and we know of no reason why the guaranty bond, issued on his behalf by the American Bonding and Trust Company should not be continued. His salary now is $————.

"Signature,                                 William J. Ostheimer, Treasurer,
                                 "On Behalf of Bourse Restaurant Co. Employer."

The first notice that was given to the company, of dishonest acts on the part of the assignor, was on May 19, 1900. The restaurant company, owing to the defalcation of Essner, was compelled to dissolve, as a joint-stock company, and the liquidating trustees brought the action in the court below against the defendant in error, to recover the amount of the indemnity named in its bond. The case is before us on the writ of error to the judgment entered by the court below, in favor of the defendant, non obstante veredicto.

It appears from the testimony that a bookkeeper was employed by Essner, and paid by the restaurant company, who kept all the accounts of the restaurant under Essner's supervision. Monthly statements were made by this official to Essner, who submitted them to the board of directors at their stated meetings. A bank account was kept by Essner in the name of the restaurant company, subject only to his check as manager. It is also in evidence that Essner drew sums from this account from time to time, in payment of his salary of $3,500, the amounts of which were charged against him by the bookkeeper. On December 23, 1899, when the certificate above quoted was given by the treasurer of the restaurant company, no general audit or expert examination had been made of the books since the preceding February, and the treasurer, who signed the certificate, testifies as follows:

"Q. Are you familiar with Mr. Essner's books? A. No, sir; not at all. Q. You never saw those books at all? A. No, sir. It was not my business to do that. Q. The only examination of those books made by any one on your behalf was the annual examination made by the auditor? A. We took his report. Q. You took his report entirely? A. Yes, sir. Q. Did you see the accountant's report which was made in February, 1900? A. No, sir. I saw the letter; I did not see the report. Q. Was this report ever presented at the meeting of the board of managers? A. I do not know that it was. Q. Whose duty was it to examine this report? A. We had the letter. I was not there at that meeting which took place in January, I think. Q. Mr. Showell said he did not examine it, and you say you did not examine it. A. I merely saw the letter. Q. And never examined the report at all? A. I did not examine it."

When the certificate signed by the witness was shown him, he testified as follows:

"Q. Did you sign that paper? (Paper shown witness). A. Yes, sir. I signed that paper. Q. You signed that paper in advance of the renewal of this bond, did you not? A. When is the renewal date of the bond? Mr. Junkin: December 23d. By Mr. Bracken: Q. The bill and receipt for the money is dated January 10, 1900. This paper was signed before that? A. That was always done every year, because the books were examined in February of the preceding year, and the bond fell due in January, and the renewals came in December. Q. You mean when you signed this paper

that the accounts were right, that the books had been audited in February of the same year? A. No; I did not mean that at all. I had been to the meeting. Our meetings are on the second Tuesday of each month, and on the second Tuesday in December we had a meeting at the Bourse restaurant, and the statement was presented, and on the strength of that statement I signed that renewal. Q. You had not personally made any examination of the books at all? A. I only took the statement. By Mr. Junkin: Q. You took the regular monthly report as handed in by the bookkeeper? A. Yes, sir. By Mr. Bracken: Q. Have you that report here? A. No; I haven't that report. But I received the rent regularly, the amount due every month, so we had no suspicion."

It thus appears by the testimony of the treasurer of the restaurant company himself, who signed the certificate of December 23, 1899, upon which the renewal of the bond, upon which suit was brought, was made, that he can give no better account of the information upon which he made the said certificate than that just quoted from his testimony. This certainly is not a satisfactory explanation of the positive statement made to the bonding company in that certificate, that "the books and account of Mr. C. G. Essner, in our employ as ―――― were examined by us, and we found them correct in every respect, and all moneys handled by him accounted for, to the best of our knowledge and belief." At the time this certificate was made, it is in testimony, and not denied, that Essner had taken out of the proceeds of the restaurant business, for his personal use, since the preceding February, $3,700, in excess of the amount to which he was entitled as salary. A part of this amount is included in the defalcation of over $18,000, for which suit is brought, and of which the bonding company was first notified in May, 1900. The monthly reports of which Ostheimer speaks in his testimony, were made by one West, the bookkeeper employed for the restaurant company by Essner, and whose accounts were kept under his, Essner's supervision. These reports, according to the testimony of West himself, were sometimes what he called "trial balances," and generally purported only to show current receipts and expenditures. These reports were made by West to Essner, and by him submitted to the directors. They were not in any sense, nor did they purport to be, an audit of Essner's books or accounts, or show the result of any examination of the bank account kept by Essner in the name of the restaurant, and on which Essner alone drew the checks. It seems to us obvious that Ostheimer, as treasurer, and in behalf of the restaurant company, falsely certified to a verification which in fact had not been had, and was guilty of such laches as should defeat a recovery.

The learned judge of the court below submitted to the jury the question, whether, on all the testimony, Essner was to be regarded as lessee of the restaurant company, or merely their manager, correctly stating that, if they should find that he was the lessee, their verdict should be for the defendant, because the moneys he received, he would in that case have received in his own right, owing to the restaurant company only the stipulated rent; his appropriation of money, therefore, would not come within the description of embezzlement or larceny. If, however, the jury should find that Essner was the manager, and not the lessee, of the restaurant company, then the question was submitted to the jury, whether the said restaurant com-

pany had discovered any fraudulent or dishonest acts on the part of Essner, prior to the certificate of December 23, 1899, or had neglected to avail itself of such sources of information as it was bound to avail itself of, in order to discover whether such fraudulent or dishonest acts had been committed. Proper rules for their guidance, in the determination of these questions, were, in our opinion, given to the jury by the learned judge. The court reserved the question, covered by the prayer of counsel for the defendant asking for binding instructions, whether there was any evidence to go to the jury in support of plaintiffs' claim. Upon a motion for judgment for defendant, non obstante veredicto, the court, after argument, granted the motion and directed judgment to be entered for the defendant on the point reserved. 112 Fed. 620. In this, we think the learned judge of the court below was right.

It is quite true, that the written contracts of indemnity, issued by such companies as the defendant in error, have come to be looked upon by courts, and to be treated, more as policies of insurance than as bonds. As contracts of indemnity, they will be liberally construed so as to effectuate the purpose for which they were issued, and as, like policies of insurance, they are generally prepared by the bonding company, the rule of contra proferentem will often be applied in construing their stipulations. "But," as was said by Mr. Chief Justice Fuller, in the recent case of Guaranty Co. of North America v. Mechanics' Sav. Bank & Trust Co., 22 Sup. Ct. 124, 46 L. Ed. ——, "this rule cannot be availed of to refine away the terms of a contract, expressed with sufficient clearness to convey the plain meaning of the parties, and embodying requirements compliance with which is made the condition to liability thereon." In this case, the parties to the contract have seen fit to expressly declare, that certain statements made by the restaurant company, relative to the duties and accounts of the employed, together with any statements or declarations thereafter required by or lodged with the company, do and shall constitute an essential part, and form the basis, of their contract. This declaration is clear, unambiguous, and manifestly covers the certificate asked for by the defendant in error, as a condition precedent to the renewal of its bond. Let us refer again to the language of this certificate. It is in part as follows:

"To American Bonding & Trust Company of Baltimore City: This is to certify, that on the 23d day of December, 1899, the books and account of Mr. O. G. Essner, in our employ as —— were examined by us and we found them correct in every respect, and all moneys handled by him accounted for, to the best of our knowledge and belief. * * *"

This certificate was signed by William J. Ostheimer, as treasurer, and in behalf of the Bourse Restaurant Company. Yet, by the testimony of this same person, called on behalf of the plaintiffs in error, it appears that the books and accounts of Essner, as an employé of the restaurant company, had not been examined by the said treasurer, or by any other officer in behalf of said restaurant company, within any reasonable time prior to the date of said certificate. The monthly reports made by Essner, through West, his bookkeeper, and upon which alone Ostheimer testifies that he relied, in making his

certificate, did not and could not furnish the information that would justify the statement of the certificate. It appears, therefore, from the testimony offered by the plaintiffs, that no examination at all, of the books and accounts of Essner, was made, as certified to by the restaurant company. There was then a clear and absolute noncompliance with this essential requirement. The certificate to the contrary was a false certificate, and as that certificate was made by express stipulation between the parties, to "constitute an essential part and form a basis of this contract," the obligation of the contract itself is destroyed.

In the face of a requirement made so absolute and unequivocal by the terms in which it is expressed, the contention of the plaintiffs in error, that if the examination were such as the company was in the habit of making, it would be sufficient, or, that if the examination were made in good faith, and the certificate signed in good faith, all the requirements were fulfilled, cannot be sustained. As said by the learned judge of the court below, in his opinion upon the motion for judgment, non obstante veredicto, "if an examination of the employed's accounts had been made, the employer would probably not have been bound to do more than act in this regard with a reasonable diligence and in good faith; but where no examination at all is made, in spite of a positive certificate to the contrary, the employer must at least be charged with knowledge of what appears on the very surface of the accounts. What thus appears, was an apparent embezzlement of the employer's money; and of this fact, it need hardly be said that the defendant was entitled to be informed. It may have been capable of an explanation consistent with innocence, but the prima facies pointed towards guilt, and it is now clear that guilt was the fact behind the appearance."

The evidence bearing upon the point reserved was undisputed. The certificate of December 23d, and the relevant provisions of the contract, speak for themselves. It was peculiarly, therefore, a matter for interpretation by the court, and binding instructions to find for the defendant might properly have been given. Therefore, the motion for judgment, non obstante veredicto, was properly disposed of, and the judgment of the court below, in favor of the defendant, is affirmed.

ACHESON, Circuit Judge (dissenting). I am not able to agree with my Brethren in their expressed conclusions, and I dissent from the judgment of affirmance.

1. In my view, there was no question of law properly reserved, upon which the court below could enter judgment for the defendant against the verdict in favor of the plaintiff. After evidence on both sides had been put in, and at the close of the court's charge, the learned judge said: "I reserve the question whether there is any evidence to go to the jury in support of the plaintiff's claim;" and, in response to an observation by the defendant's counsel as to the scope of the reservation, the judge added: "I reserve your last point, which asks for binding instructions." With great respect for the learned judge below and my associates here, I must express my conviction that this

was not a reservation of any question of law, but a reservation of the whole case. If, under such reservation, judgment may be entered for the defendant notwithstanding a verdict in favor of the plaintiff, then the verdict becomes a mere matter of form, and the court ultimately exercises the function of both judge and jury. I cannot agree that such disposition of a case is equivalent to a binding instruction to the jury to find in favor of the defendant. For in that case judgment would be entered for the defendant upon a verdict in his favor. But here the verdict of the jury upon the facts was in favor of the plaintiff, and no stated question of law was reserved. The mode of procedure here followed, I think, is an unwarrantable departure from the constitutional provision: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rules of the common law."

2. But assuming that there was a proper reservation, the court, I think, erred in giving judgment for the defendant. Under the charge of the court, the jury, in rendering a verdict for the plaintiff, must have reached the conclusion that the employer, the Bourse Restaurant Company, Limited, at no time before the last renewal of the indemnity bond in December, 1899, had discovered any fraudulent or dishonest act on the part of its manager, Essner, and that no fact had been brought to its attention which would fairly and properly give that information. The evidence fully justified such a finding. The bond required on the part of the employer good faith and reasonable diligence only. Section 9 of the bond declares that "any material misstatement or suppression of fact by the employer, in any statement or declaration to the company," shall avoid the bond; and section 10 provides that the bond shall be avoided "if the employed has, within the knowledge of the employer, been a defaulter at any time during his service." Now it is demonstrable by this record that the jury must have found that the plaintiff company had no such knowledge at the time of the last renewal of the bond or before. Moreover, the certificate of December 23, 1899, which the defendant sent to the plaintiff company to be executed, and which Mr. Ostheimer, the company's treasurer, signed, in terms is "to the best of our knowledge and belief." The evidence showed the exercise of great vigilance by the Bourse Restaurant Company in respect to the acts of its manager, Essner, in the conduct of its business. Annually, after the close of the business year, which ended on January 31st, there was an audit of his accounts and books by expert accountants. Then monthly reports or statements in writing were made by the company's bookkeeper (West) from the books, and were laid before the board of directors at their monthly meetings, which were held on the second Tuesday of every month. Such a report or statement was before the board at its meeting in December, 1899. There was no reason for the board, or Mr. Ostheimer, who was present at that meeting, to doubt the completeness of that statement made by the company's bookkeeper from the books. It disclosed nothing wrong in the manager's accounts or books. The learned judge below fell into inadvertent mistake of fact in saying that

"no examination whatever had been made of the books and accounts of the employed at the date named or for nearly a year before," and that the statement presented to the company in December, 1899, was made "by the bookkeeper of Mr. Essner." It clearly appears that Mr. West was the company's own bookkeeper, and the evidence justifies the conclusion that his December statement was made up from his examination of the books and accounts. The certificate of December 23, 1899, was signed by Mr. Ostheimer, the company's treasurer, in perfect good faith, after the December examination of the books and written statement were made by West. Such an examination had to be made by some competent employé, and, under the proofs, I cannot doubt that Mr. Ostheimer, in signing the certificate, had a right to act upon West's examination and written report. When the condition of this indemnity bond speaks of the employer's knowledge that the employé is a defaulter, surely it means actual knowledge, and not constructive notice through some subordinate employé who may have acted negligently in his examination or report. The mere negligence of the insured or his servant does not take a loss thereby occurring out of the protection of the policy. Wood, Ins. § 101. If the foregoing views are not sound and apt, then, truly, are employers' indemnity bonds (so-called) instruments "that palter with us in a double sense,—that keep the word of promise to our ear, and break it to our hope."

West did not call the attention of the board to Essner's overdraft, and it was not known to Mr. Ostheimer or to any of the officials or directors of the company. The fact that Essner had overdrawn his account did not necessarily imply embezzlement. His ledger account on its face showed regular debit entries for all moneys he had drawn out. There was no attempt at concealment. Before the end of the then current business year, the balance against Essner had been reduced to $969. The expert accountants who made the audit in February, 1900, treated this balance of $969 as a legitimate debit. Moreover, Mr. Hayes, one of these expert accountants, testified thus:

"Q. In making this report in February, 1900, did you find any evidence of any fraud? A. No, sir; we saw no evidence of that kind. Q. Was there anything that you saw in the books to make you suspicious that Mr. Essner was embezzling the moneys of that concern? A. No."

The report of the experts made in February, 1900, which covered the preceding business year, was entirely favorable to Essner. It was for the jury to determine whether entries appearing in the books in December, 1899, imported embezzlement. Indeed, upon every question of fact, it was for the jury, and not for the court, to draw from the evidence the proper inferences.

DALLAS, Circuit Judge (concurring). Upon the subjects mainly discussed in the principal opinion in this case, nothing further need be said; but upon one point, which the dissenting opinion has made a serious one, I deem it proper to add a few words.

The judgment here complained of was entered upon a point which the learned trial judge reserved in these words: "I reserve the question whether there is any evidence to go to the jury in support of the

plaintiffs' claim." In our opinion, this was a good reservation. The supreme court of Pennsylvania has, after argument and reargument before a full bench, distinctly so decided (Fisher v. Scharadin, 186 Pa. 565, 40 Atl. 1091; Boyle v. Borough of Mahanoy City, 187 Pa. 1, 40 Atl. 1093); and within the knowledge of the writer, the circuit court for the Eastern district of Pennsylvania, from which this case comes, has in a number of instances, and without protest or disapproval in any, reserved precisely the same point. Indeed, counsel in this cause appear to have regarded the practice as settled, for "the record shows no objection or any exception to the form of the reservation." Boyle v. Borough of Mahanoy City, supra. The reserved point, as it had been explicitly stated, was not varied by the colloquy of the judge and defendant's counsel at the conclusion of the charge. Counsel said: "I understand that the question whether or not the case can be submitted to the jury to find that the defendant is liable, is reserved by the court;" and the learned judge replied: "I reserve your last point, which asks for binding instructions." The intention and import of these remarks, when connectedly read, appear to have been, not to add another point to that which had already been stated, but to indicate the practical effect of its reservation; and whether this was or was not accurately done is unimportant, for it is quite manifest that the judgment which was subsequently entered was in fact rested solely upon the ground that there was no evidence to go to the jury in support of the plaintiffs' claim; and consequently, even if the court had been in error in supposing, at the trial, that the reservation of that question was equivalent to reserving a request of defendant for binding instructions, no harm would have been done to the plaintiffs. But in our opinion there is no substantial difference between a judgment entered upon a directed verdict for defendant and one entered in his favor notwithstanding a verdict rendered for plaintiff, subject to the question whether there was any evidence to warrant it. "Whether there be any evidence which entitles the plaintiff to recover is necessarily a question of law" (Fisher v. Scharadin, supra); and that question it is which, by either method of procedure, and with like effect in each, the court decides. No encroachment is made upon the domain of the jury where either course is pursued. Its province of finding facts from evidence is not at all invaded. All that is adjudged is that a verdict which is unsupported by any evidence cannot properly be made the basis of a legal judgment; and the soundness of this fundamental proposition is now, we think, too well established to admit of question or be open to debate.

Although certain questions of fact were submitted by the court, and were found for the plaintiffs, yet the question "whether there was any evidence at all to go to the jury, upon a particular fact essential to the plaintiffs' case," was one of law, upon which binding instructions might have been given; and it was this question of the absence, not of the effect, of evidence, which the learned judge reserved and decided. Boyle v. Borough of Mahanoy City, supra.