**MARYLAND CASUALTY CO. · v. DUNLAP
et al.
No. 2835.**

Circuit Court of Appeals, First Circuit.
Dec. 15, 1933.

290

Edward F. McClennen, of Boston, Mass. (Arthur E. Whittemore and Edward Williamson, both of Boston, Mass., on the brief), for appellant.

John L. Hall, of Boston, Mass. (Charles H. Beckwith, of Springfield, Mass., and Bailey Aldrich, of Boston, Mass., on the brief), for appellees.

Before WILSON and MORTON, Circuit Judges, and LETTS, District Judge.

MORTON, Circuit Judge.

This is an action upon a bond conditioned to secure the performance of a contract to erect a building intended for use as a theater. It was tried to a jury; there was a verdict for the plaintiffs and a judgment thereon from which the defendant has appealed. We shall refer to the parties, plaintiff and defendant, as they appeared in the lower court.

The principal on the bond was the owner of the land, a corporation known as "1694 Main Street Corp.," referred to by the auditor as the "Friend Co." The defendant signed the bond as surety. The obligees were the first mortgagee of the premises, the Springfield Institution for Savings, and the second mortgagees, Dunlap and others as trustees of the Dunlap Realty Trust. The Main Street Corporation bought the real estate in question and agreed to improve it and erect a theater on it. The two plaintiffs made loans to the Main Street Corporation in connection with this purchase and plan. They required and received the bond in question in order to make sure that the new building, on which they relied as part of their security, would be completed. When it was about half done, the contractor abandoned the work. The plaintiffs thereupon made an entry to foreclose, and afterwards the Dunlap trustees bought the property at foreclosure sale. They completed the building, though not exactly as called for by the Main Street Corporation's plans; and this action is brought to recover the loss occasioned by the failure of the Main Street Corporation to carry out its agreement. The Institution for Savings has no real interest in the case. It joins as a party only because, the bond being to joint obligees, it is legally necessary for it to do so. The Dunlap trustees are the real plaintiffs and will be referred to as the plaintiffs.

The first point made for the defendant is that the building to which the bond relates was an illegal structure, and for that reason no action is maintainable on the bond. The laws of Massachusetts forbid the use of a building as a theater which does not conform to certain requirements, and make criminal the erection of buildings in violation of their provisions. General Law Ter. Ed. c. 143, § 26 et seq. In the administration of the statute, plans are submitted to the proper officials in advance of construction, with a request for an approval certificate, as was done in this case. The plans and specifications referred to in the bond did not meet the requirements of law, in that the rear wall

was not thick enough and a required stairway was lacking. The plans were amended to meet these objections, and the work proceeded. The changes increased the cost of the building about $6,500.

The auditor found: "It is true that these changes in the plans were made without the knowledge or consent of the defendant. It is equally true that they were not even remotely responsible for the Friend Company's (i. e. the Main Street Corporation's) default. The building, called for in the May plans (i. e. the amended plans) and started by the Friend Company, was substantially the same building called for by the bond plans." The auditor further found that: "When the bond was executed there were approved and made a part thereof, by the signature of the parties, a set of plans, a volume of specifications and a pamphlet containing the usual conditions of building contracts as approved by the American Institute of Architects. These three documents define the building which the defendant guaranteed that the Friend Company (the Main Street Corp.) would erect. * * * " "None of the parties intended that the construction should be unlawful or in any way contrary to the building laws. On the other hand they expected, in accordance with every day experience, that some changes might be necessary as the work progressed." Article 11 of the contract referred to provided: "If the contractor observes that the drawings and specifications are at variance therewith (i. e. with laws, ordinances, rules and regulations bearing on the conduct of the work) he shall promptly notify the architect in writing, and *any necessary changes shall be adjusted as provided in the contract for changes in the work.*" (Italics supplied.)

It was under this provision that the changes above referred to were made. All parties knew that theater buildings had to comply with the requirements of law, and that changes in the original plans might be necessary to meet the views of the authorities. It is clear that the bond was entered into by the defendant on this understanding. It was not a hard and fast contract to erect an illegal structure. The expressed purpose of the contract was that the building should be in all respects legal, and under the amended plans it was legal. The defence of illegality seems plainly untenable.

■ The changes from the original plans were not of such extensive character as to be beyond what was contemplated in the contract. The jury must have so found. They were relatively slight, and they worked no harm to the defendant in any way. The damages assessed against it were based on the building called for by the original plan. The defendant's obligation under the bond is as broad as the contract which it, in effect, guaranteed. It is well settled that compensated sureties stand on a very different footing from voluntary ones. They are in effect insurers and ought not to be relieved from their obligations on merely technical grounds, not affecting substantially the character of the undertaking which they assumed, as was expressly held in Maryland Casualty Co. v. Fowler, 31 F.(2d) 881, 63 A. L. R. 1375 (C. C. A. 4), and Hartford Accident & Indemnity Co. v. Federal Bond & Mortgage Co., 59 F.(2d) 950 (C. C. A. 8).

■ The next point made for the defendant is that the plaintiffs lost their rights under the bond by taking possession of the premises on October 29, 1927, when, it is alleged, the principal (i. e., the Main Street Corporation) was not yet in default. The short answer to the defendant's position probably is that the nonpayment of the taxes due on October 15th constituted a technical default (5 Opin. Atty. Gen. of Mass. 214, 216); but on broader grounds the position is untenable. The contract which the bond guaranteed provided that the building should be completed by November 1, 1927. The taxes which became due on October 15th were not paid, and the construction company abandoned the work on October 24. It was in this situation that the plaintiffs made a formal entry to foreclose the mortgage. They never undertook to exclude the owner, contractor, or defendant from the premises; and the formal entry seems not to have had the slightest effect on the work of erecting the building. In Fletcher v. Cary, 103 Mass. 475, 477, it is said of such an entry: "It is a formal entry, and a constructive rather than a literal taking of possession. It is of no importance that it produces no change in the occupation. It is not an entry for the purpose of literally ousting and expelling the mortgagor. * * * " See, too, Furnas v. Durgin, 119 Mass. 500–505, 20 Am. Rep. 341; Morse v. Bassett, 132 Mass. 502, 509; Palmer v. Fowley, 5 Gray (Mass.) 545.

The auditor finds that on October 29th "it was perfectly apparent to everybody that no human agency could complete the theatre on November 1, 1927, as the bond required." The abandonment of the work under such circumstances was obviously an abandonment of the contract by the Main Street Corporation and might be treated as an immediate breach

of it. It is equally clear from the report, and from the evidence as a whole, that the building could not possibly have been' completed within 30 days after November 1, assuming that the 30-day clause extends, for the benefit of the surety, the time for completion stated in the contract. The defendant made no suggestion that it would undertake the completion, nor any request that it be allowed to do so.

Some question is also made as to the alleged failure to give notice of defaults as required by the bond. It is argued that the Institution for Savings cannot recover, being barred by its failure to do so, and that therefore the Dunlap trustees are also barred. The bond explicitly provides, however, that the failure of one obligee to give notice "shall not affect the rights of the other obligee." The dictum in Farni v. Tesson, 1 Black, 309, 314, 17 L. Ed. 67, is against the defendant's contention. It is there said: "Though all the parties to it [the joint bond] should join in the suit, and show a legal title to recover, the judgment will be for the use of the party named in the condition, and equitably entitled to the money." Grier, J., page 314 of 1 Black. There was a temporary default by the Main Street Corporation in the payment of the interest on the first mortgage to the Institution for Savings which became due on June 1, 1927. This default was subsequently made good and the interest was paid and accepted. The bond is not avoided by temporary default of this character. Maryland Casualty Co. v. Fowler (C. C. A.) 31 F.(2d) 881, 884, 63 A. L. R. 1375.

The next question which we shall notice relates to the ruling of the trial judge that there had been no breach of the contract by the plaintiffs in respect to the "progress payments" so called. The bond provided as one of the express conditions that trustees for Dunlap Realty Trust should make payments in accordance with an elaborate schedule of payments attached to and made part of the bond. The plaintiffs appointed an engineer to advise them when these stages had been reached and made payments on his certificates. He treated the schedule somewhat freely, as indicating the proportionate amount of the total work called for at which progress payments would be made. There was no evidence that payments were made for more than the work actually performed. The order in which different parts of the work were carried forward appears to have been influenced to some extent by a strike in the steel industry. The contractor adapted the progress of the work to the exigencies of the situation, so as to keep the erection going on. Inhabitants of Wakefield v. American Surety Co., 209 Mass. 173, 178, 95 N. E. 350. The objection is a pure technicality, and we think an unmeritorious one.

The defendant also urges that no "progress payments" should have been made during the period when interest on the first mortgage was in default, i. e., from June 1, 1927, to September 24, 1927. As to these payments the plaintiffs undoubtedly took a chance. If the default should become permanent, payments made after it occurred would have to be regarded as unexpended funds in their hands, if it came to the assessment of damages. Globe Indemnity Co. v. So. Pac. Co. (C. C. A.) 30 F.(2d) 580. When, however, the default was cured by the payment and acceptance of the interest in question, the progress payments during the interim became justified.

The remaining assignments of error relate to the exclusion of evidence offered by the defendant, and to certain requests for rulings which were refused. In connection with them certain additional facts should be stated. After the abandonment of the enterprise by the Main Street Corporation the plaintiffs took over the property and completed a theater building, making use of what had been done under the contract. The measure of damages adopted was: "The difference between the value of the premises at the date of the breach of the bond, and their value if the building had been constructed as agreed, or so much thereof as would have been necessary with the value of the building as it was left to have paid the mortgage debt." See Province Securities Corp. v: Maryland Casualty Co., 269 Mass. 75, at page 94, 168 N. E. 252, 257.

The excluded evidence related mainly to damages and to the weight or credibility of testimony. One Carlson called by the plaintiffs testified to an estimate made in 1930 for use in this case of the cost of completing the building in 1927 according to the bond plan. In connection with this estimate, he apparently testified to the actual cost of the theater as it was built by the plaintiffs, the completed building differing, as has been said, in certain respects from that called for by the original plans. Carlson's 1930 estimate of the cost to complete according to the original plans was $351,000. The defendant contended that this was a very excessive amount, though it seems not to have called any witnesses in support of that contention.

Included in the $351,000 was an item of $64,000 for general expenses and builder's fee. It appeared that Carlson or his company did the work of completing the building from the point where the original contractor left it. This work was done in 1929. The witness testified that the theater put up by the plaintiffs was in details substantially different from that contemplated by the bond plans, although in shape and form the two were not substantially different. On cross-examination Carlson was asked whether he had not actually charged for builder's fee and general expense $40,000 instead of $64,000 which he estimated. The court excluded this line of inquiry, and the defendant excepted. The evidence was urged as affecting Carlson's credibility and good faith. The extent of cross-examination for such purposes is largely within the discretion of the trial judge. He may have felt that the inquiry as to what was covered by the $40,000 charge, as compared by what was covered by the $64,000 estimate, involved a purely collateral issue which might take considerable time and be confusing rather than helpful in its total effect. We cannot say that these views, if held, were unreasonable, or that the ruling was so clearly wrong as to be an abuse of discretion. New England Trust Co. v. Farr, 57 F.(2d) 103, 110 (C. C. A. 1).

▮ On the cross-examination of the plaintiff Dunlap, he was asked by the defendant whether the plaintiffs had not received much lower estimates for the completion of the building than that testified to by Mr. Carlson. This evidence was excluded. We think rightly so, for rather obvious reasons. Mr. Dunlap was also asked on cross-examination whether Mr. Carlson had not submitted a much lower figure than the $351,000 estimate which he testified to. This evidence also was excluded. If admitted, it would have required going into the other estimate and comparing the two, making allowances for difference in dates, etc. This question also was collateral to the main issue. It bore chiefly or wholly on Carlson's credibility and good faith. It related only to an offer which never ripened into a contract. It might well involve a good deal of time. We cannot say that the District Judge was clearly wrong in refusing to go into the matter. The same thing may be said of the exclusion of the written evidence on the same line. The evidence as to the precise character and significance of this paper and the circumstances under which it was made is not very clear. The plaintiffs contend that it was part of negotiations for settlement. It includes a number of items, and much evidence might have been necessary to show what each covered. The trial judge may well have thought that its ultimate value was too problematical to justify going into it.

▮ One Beston was called by the plaintiff as a real estate expert and gave opinion evidence as to fair market values. On cross-examination a number of different questions were put to him by the defendant as to what assumptions of values, rents, etc., he made in arriving at his figures. Several of these questions were excluded, and the defendant excepted. As to some of them the exclusion was certainly right, e. g., when the witness was asked to compare for rental purposes the theater as built by the plaintiffs with the theater originally contemplated. Johnston v. Cassidy, 279 Mass. 593, 597, 181 N. E. 748. It is true that the witness agreed that the two theaters were substantially the same; but comparisons of that sort open such a wide field for collateral inquiry and bear so indirectly on the question at issue that it is seldom wise to go into them, especially where differences in time and in business conditions have also to be taken into account. See Johnston v. Cassidy, supra. These observations apply also to the excluded question to Dunlap as to the rent received, in or after 1929, for the theater built by the plaintiffs.

▮ Requests for rulings made by the defendant and refused by the judge, to which exceptions were taken, dealt with special facts and requested the judge to comment on them to the jury. The function of requests of this character is to call the facts to the attention of the trial judge in order that he may, if it seems to him wise, comment on them to the jury. To justify sustaining exceptions to the refusal of such requests, it must appear that the charge as given was so unfair to the losing party by reason of the failure to refer to the matters presented, or by wrong references to them, that the verdict ought not to stand. Barnes v. Berkshire St. R. Co., 281 Mass. 47, 183 N. E. 416, 418. It is a heavy burden which in this case is not sustained.

The defendant's other exceptions have been examined. They do not seem to us to be well founded, nor to require comment. The judgment must be affirmed.

The judgment of the District Court is affirmed, with interest and costs in this court.

WILSON, Circuit Judge, concurs in the result.