### MOORE v. MARYLAND CASUALTY CO.
#### No. 3142.

District Court, D. Massachusetts.

Aug. 6, 1935.

Harold S. Davis and Palmer, Dodge, Barstow, Wilkins & Davis, all of Boston, Mass., for plaintiff.

Arthur Thad Smith, Bartlett, Jennings & Smith, and Edward F. McClennen, all of Boston, Mass., for defendant.

BREWSTER, District Judge.

This is an action at law, brought upon a surety bond given by the defendant to secure the completion of a building in Brookline. The principal obligor was the Pelham Hall, Inc., a Massachusetts corporation, organized for the purpose of acquiring land and erecting thereon an apartment house known as "Pelham Hall."

The action was referred to an auditor and was later recommitted for further findings of fact. The case was tried without a jury upon the auditor's original and supplemental reports and exhibits. The bond is in the penal sum of $500,000. Its execution in the regular course of business upon payment of an established premium is admitted.

Apparently the parties proceeded before the auditor as if the action was for breach of condition of the bond. Accordingly, if plaintiff is entitled to recover on the bond, he is entitled to a judgment for the penal sum of $500,000, execution to be awarded for so much of the penal sum as is "due and payable in equity and good conscience" at time of issuance of execution. Gen. Laws (Ter. Ed.) Mass. c. 235, §§ 9 and 10.

The first question, therefore, to be decided is whether, on the facts found by the auditor, plaintiff has made out a case of breach of covenant of defendant's bond.

Before the auditor, the controversy was waged along a wide front. Numerous defenses, some of them technical, were interposed, but inasmuch as the argument before me related principally to the question whether the defendant was released by reason of certain changes made in the building as the work progressed, I confine my opinion to that single issue.

My views on the other defenses are indicated in my rulings on requests.

In order to better understand the consideration of this question, a preliminary statement of facts appearing in the auditor's report is necessary. The Pelham Hall, Inc. (hereinafter referred to as the owner) financed the construction of the building by means of an issue of bonds, secured by a mortgage on the land and on the building which it agreed to erect. It entered into a written contract with the American Bond & Mortgage Company, Inc. (hereinafter referred to as the American Company), to sell the bonds. This contract, called the "Brokerage Agreement," was entered into on the 7th day of July, 1925. Pertinent provisions of this contract will be referred to later. According to its terms, a mortgage was given to the plaintiff, as individual trustee, and to the American Trust and Safe Deposit Company, an Illinois corporation, as corporate trustee, to secure an issue of $1,200,000 in amount of bonds of the owner. The brokerage agreement required the owner to give a bond with sufficient surety in the penal sum of $500,000 for the completion of the building by the owner. This bond was given, the owner being the principal and the defendant the surety, and ran to the American Company, to the plaintiff as individual trustee, and to the holders, from time to time, of the bonds. According to the terms of the brokerage agreement and the mortgage, the building was to be completed before August 1, 1926. The general contractor, who undertook the work of construction, became financially involved and abandoned the work. The owner was not able to complete the building with the unexpended balance derived from the sale of the bonds, and the defendant was called on to complete the building. This, the defendant refused to do, whereupon the plaintiff took possession, completed the building

and expended for that purpose $181,500 in addition to $125,000 then in the hands of the American Company. This $181,500 was borrowed by the plaintiff from the American Company and expended by him in the completion of the building.

During the progress of the work, changes were made in the plans without the consent of the defendant. Because of the changes, the defendant now contends that it cannot be held liable on its bond.

In order to dispose of defendant's contention, it is necessary to consider first the undertakings of the principal, for which the plaintiff became surety; second, the contract of suretyship; and, third, the changes and their legal effect.

The findings of fact made by the auditor are not attacked, although plaintiff assails, as erroneous, certain conclusions of law embodied in the auditor's report.

First: The owner's agreement respecting the construction and erection of the building is found in two instruments, namely, the brokerage agreement, and the mortgage. In the brokerage agreement it is recited that the owner is to start erecting "an eight story, basement and penthouse apartment building to contain *approximately* 415 rooms and 1,390,000 cubic feet, as further defined in paragraph 15, page 5 and schedule 'B' of this agreement." (Italics supplied.)

Paragraph 15 is a guarantee by the owner that the building erected will contain not less than the stipulated number of cubic feet.

Schedule B, entitled "Description of Building which the Owner agrees to erect," gives certain specifications, of which the following are pertinent. It shows that the building was to be an eight-story, fireproof building, with stores and apartments on the first floor and apartments on all floors above. The number of apartments was "to be in accordance with plan to be approved by broker." In the brokerage agreement the owner further covenanted with the broker "for the use and benefit of the trustee or trustees and of each of the holders of the bonds to be secured by said mortgage"; that it submitted to the broker only a preliminary sketch of the typical floor plans of the building, and that it would submit and deliver to the broker within 45 days from the date thereof complete plans and specifications prepared by an architect satisfactory to the broker, and the owner agreed to employ a general con-

tractor satisfactory to the broker. The owner agreed that all contracts with contractor should provide for the erection and construction of the building according to plans, drawings, and specifications presented to and approved by the broker, and that it would make no alteration, modification, or changes in the contract without the approval of the broker. The brokerage contract contains also the following paragraph: "Should the plans or any modification thereof not be in the hands of the broker at the time of the execution of this agreement they shall be submitted to the broker before they are approved by the Superintendent of Buildings or any other department or official whose approval is required and the building shall be constructed in strict accordance with the plans and specifications *and such modifications as are approved by the broker in writing.*" (Italics supplied.)

It was covenanted that if the construction of the building should be discontinued at any time, the trustee might complete the building, and any sum expended for that purpose in excess of the proceeds of the bond should be deemed as additional indebtedness secured by the mortgage.

The owner agreed in the brokerage agreement, as part consideration for the broker entering into the contracts, to furnish to the broker a surety bond with a surety company thereon as surety running to and operating for the benefit of the broker; the trustees in the mortgage and the holders of the bond, to secure which the trust mortgage was given, guaranteeing the completion, and the full payment by the owner, of the building, to be when completed free and clear of any and all liens equal or superior to the lien of the first mortgage.

The mortgage, or deed of trust, given by the owner to the plaintiff and the corporate trustee, is an elaborate document containing the usual provisions in such trust mortgages, with provisions relating to the construction, erection, and maintenance of the building to be erected on the land covered by the mortgage. These provisions are found in Article IV. It will not be necessary to set these out in full. It appears that a fireproof apartment building of not less than eight stories was to be completed on or before August 1, 1926, containing not less than 1,390,000 cubic feet of cubical contents; that the apartment building should contain not less

than 151 apartments with a total of not less than 419 rooms; the building to be constructed and erected "substantially in accordance with plans and specifications prepared by an architect satisfactory to the American Bond and Mortgage Company, Inc."

In section 2 of Article IV, the owner expressly covenants to fully pay for the building and all bills or claims contracted or incurred in connection with the erection and construction and equipment thereof. This section further authorizes the plaintiff to pay such bills or make up any deficit in connection with the construction and erection of such building, the owner expressly agreeing to repay to the plaintiff on demand any sums advanced by him, in accordance with the foregoing provision, and to reimburse him for any such advances, and any and all sums advanced by him under said provisions "shall be deemed a charge and lien on said premises as provided in Article VI hereof and the same may be paid to the said trustee from the proceeds of the sale of said bonds."

Article VI provides that the trustee is authorized, but not required, whenever there shall be delinquency by the owner in the performance of the covenants of the indenture, to perform such covenants for and on behalf of the owner. The owner expressly covenants to pay the individual trustee all moneys advanced or expended pursuant to the provisions of the indenture, with interest at the rate of 7 per cent. per annum, "all of which sums shall be a first lien on the said premises prior and paramount to the bonds hereby secured and are declared to be so much additional indebtedness secured by this indenture. * * *"

Second: Coming now to the contract of suretyship, it has already been stated that the American Company, the plaintiff, and the legal holders from time to time of the mortgage bonds are the obligees; that the owner is the principal and the defendant the surety, on a bond in the penal sum of $500,000. In the conditions of the obligation it is recited that "Whereas, the Principal has agreed under the terms of 'the brokerage agreement' and is about to agree in said mortgage 'to erect, construct and complete upon the premises described in said mortgage or deed of trust, an eight story apartment house containing one hundred fifty-one suites, first-class construction, all in accordance with plans of

Arthur H. Bowditch, Architect, within the time and in the manner set forth in said trust deed, and in said agreement between said Principal and said American Bond and Mortgage Company, Inc., and in accordance with the plans and specifications prepared on behalf of the Principal and submitted to and approved by said American Bond and Mortgage Company, Inc., and in accordance with such further plans, specifications and details as the American Bond and Mortgage Company, Inc., may from time to time approve, but which shall not increase the cost of construction, except with the consent of the Surety (reference to which plans, specifications, and details is hereby made, which plans, specifications, and details are hereby made part hereof by reference thereto as fully to all intents and purposes as is set forth in full in the body hereof). * * *."

The essential conditions of the bond were that the building should be well and truly erected according to all the terms, covenants, conditions, and requirements of said plans and specifications and in accordance with the terms of said agreement and the terms of said mortgage and deed of trust, free and clear of all liens, so that the lien of said mortgage should be and remain the first lien upon the building and premises. It was also a condition of the bond that the surety should make good any default on the part of the principal under the terms of the brokerage agreement or of said mortgage or deed of trust "up to and including the completion of and payment for said building, in the same time and in the same manner as the said Principal is obligated to do and perform, and said Surety hereby agrees that it will, in the event of default on the part of said Principal as aforesaid, make good such default * * *."

The bond also contained the further express agreements between the parties:

"1. The act of said American Bond and Mortgage Company, Inc., in waiving or releasing any default on the part of the Principal of the covenants and agreements by said Principal to be kept and performed, hereinabove referred to, shall not vitiate the terms of this bond, nor release the Surety therefrom except that the Surety shall be relieved from making good the default on the part of the Principal so waived or released by the said American Bond and Mortgage Company, Inc.

"2. Said American Bond and Mortgage Company, Inc., or said Individual Trustee, shall have the right to use the whole or any portion of the net proceeds of the sale of said bonds to make good from time to time any default or defaults of the Principal in its obligations under said contract for loan and said mortgage or deed of trust to be performed by it prior to and including the completion of said building.

"3. All sums advanced by the Obligees or any of them to make good any default of the Principal under said contract for the said bonds and said mortgage or deed of trust, in any act or thing to be done or performed prior to and including the erection and completion of and payment for said building, the surety agrees to repay the persons so paying the same, forthwith as each payment is made, with interest at the rate of seven per cent per annum from the time of the respective payments.

"4. In the event that said Principal shall fail to complete the construction of said building or should fail to pay therefor in the manner and within the time hereinabove provided, then and in such event (anything herein to the contrary notwithstanding) the Surety will and forthwith agrees to make good such default, and to complete the erection and construction of said building in accordance with the said plans, specifications and details, within a period not to exceed four months from and after the time when said Principal should have completed said building.

"5. The Surety, in making advances to or on behalf of the Obligees in making good any default of the Principal, shall be entitled to such rights as the Obligees have or would have in advancing such sums; subject, always, however, to the prior lien of said mortgage or deed of trust to the full extent of the bonds secured thereby."

Third: We are brought to the consideration of the changes that were made in the building during the process of construction. The auditor, in his supplementary report, has presented clearly and comprehensively what the changes were. The important departures from the original plan were changes, all relating to the apportionment of space on the ground floor and in the basement. According to the original plans, 10 shops were provided for on the Beacon street side of the building. In the rear of these shops were to be maids' rooms, storerooms, and corridors. The plans also showed a light court on the Pleasant street side and another light court on the opposite side of the building. The lower part of this second light court was occupied by a boiler room. As the work progressed, it was decided to increase the depth of the shops, thus cutting out corridors, storage rooms, and maids' rooms. The ceilings of all the shops were raised to the line of the first floor, thereby eliminating a mezzanine floor upon which apartments were planned. In order to provide a shipping room for the shops, the lower part of the Pleasant street light court was covered with a low roof, a few feet above the level of the Pleasant street sidewalk. An ornamental front and doorway opened to stairs which went down into the shipping room. This shipping room cut off light and air and rendered useless, for the purpose, certain rooms designed for maids' rooms, and also required a change in the location of the janitor's apartment. In order to accommodate the E. T. Slattery Company, the well-known ladies' outfitters, who opened up a branch store in the building, it was necessary to make other changes, throwing into one four of the shops, and also projecting the cellar under the street. The net result of these changes was to reduce the number of apartments from 151 to 144, and the number of rooms from 419 to 379, with a corresponding increase of space devoted to commercial purposes. There were other minor changes in the construction of the shops which the owner thought would render them more attractive. The auditor intimates that some of the apartments, opening on to the Pleasant street court, were rendered less desirable by reason of the construction of the shipping room, but he does not find that the building, as finally completed, would produce less rent than the original, and he expressly finds that the defendant has not shown that the changes increased the cost of construction. He further finds that the American Company approved these changes in writing, and that the changes were made with the knowledge and consent of the plaintiff. The defendant did not consent to these changes.

It does not appear that the plaintiff, in his fiduciary capacity, ever expressly approved or authorized the changes, but it is clear that he knew and acquiesced in them, and the auditor is correct in his conclusion that the American Company had

authority to modify the plans. Whether it had authority to modify them so far as to release the surety is a question that does not arise in view of my conclusions respecting the liability of the defendant.

■ When one considers the provisions of the brokerage contract, the mortgage and the terms of defendant's contract, it is impossible to escape the conclusion that all the parties to the transaction contemplated that the original plans and specifications might not be strictly adhered to, but, on the contrary, that they might be modified subject to the approval of the American Company, and this without the assent of the defendant if the modifications did not increase the cost of construction. The terms of the brokerage agreement and the mortgage were, by reference, incorporated in and made a part of the defendant's contract, and its obligations must be determined with reference to these terms.

The auditor has ruled that these changes in the building were material and substantial. Undoubtedly they were material in the sense that they were something more than trivial or unimportant, but it does not follow that they constituted such a departure from the contract, the performance of which the defendant guaranteed, as to relieve it from all liability thereon. The completed building, in all essential particulars, came up to the specifications incorporated in the brokerage agreement. It was an eight-story, fireproof apartment building, containing, so far as appears, the guaranteed cubical contents. The character of the tenantry was not changed, nor the purposes to which the building was to be put. The original plan contemplated shops on the first floor and apartments above. There is no finding that the value of the building, completed according to the revised plan, was not sufficient to fully indemnify the defendant, if it had elected to recognize rather than evade its obligation when called upon to complete the building.

Since the changes did not increase the cost of construction, it is difficult to see how the surety has been in any way prejudiced by these modifications. While the modifications are of a substantial nature, I regard them as within the scope of the undertaking which the defendant insured. They did not constitute a new contract, imposing additional burdens upon the surety.

■ The defendant was a compensated surety, and as such cannot invoke the ancient doctrine of strictissimi juris. United States Fidelity & Guaranty Co. v. United States, 191 U. S. 416, 24 S. Ct. 142, 48 L. Ed. 242; Supreme Council Catholic Knights of America v. Fidelity & Casualty Co. of New York (C. C. A.) 63 F. 48; Tebbets et al. v. Mercantile Credit Guarantee Co. of New York (C. C. A.) 73 F. 95, 97; Carstairs v. American Bonding & Trust Co. of Baltimore City (C. C. A.) 116 F. 449; Atlantic Trust & Deposit Co. v. Town of Laurinburg (C. C. A.) 163 F. 690, 695; City of Montpelier v. National Surety Co., 97 Vt. 111, 122 A. 484, 33 A. L. R. 489; Maine Central R. Co. v. National Surety Co., 113 Me. 465, 94 A. 929, L. R. A. 1916A, 881; Gunsul v. American Surety Co., 308 Ill. 312, 139 N. E. 620; Maryland Casualty Co. v. Dunlap (C. C. A.) 68 F.(2d) 289; Hormel & Co. v. American Bonding Co. of Baltimore, 112 Minn. 288, 128 N. W. 12, 33 L. R. A. (N. S.) 513.

For a collection of cases to the same effect, see note to the last cited case in 33 L. R. A. (N. S.) 513.

In Tebbets v. Mercantile Credit Guarantee Co. of New York, supra, the court said, with reference to an indemnity contract, that: "Corporations entering into contracts like the one at bar may call themselves 'guarantee' or 'surety' companies, but their business is in all essential particulars that of insurers, who, upon careful calculation of the risks of such business, and with such restrictions of their liability as may seem to them sufficient to make it safe, undertake to assure persons against loss, in return for premiums sufficiently high to make such business commercially profitable. Their contracts are, in fact, policies of insurance, and should be treated as such."

■ The more modern rule which, according to the great weight of authority, has been applied in cases involving the legal obligations of a compensated surety, is that the departure from the guaranteed contract must be not only material but prejudicial to the surety. United States Fidelity & Guaranty Co. v. United States, supra; National Surety Co. v. Lincoln County, Mont. (C. C. A.) 238 F. 705; City of Montpelier v. National Surety Co., supra; Maryland Casualty Co. v. Dunlap, supra; Miles & Son Co. v. Ætna Casualty & Surety Co. (D. C.) 1 F. Supp. 925;

United States **v.** Quaker Industrial Alcohol Corporation (D. C.) 2 F. Supp. 863; Atlantic Trust & Deposit Co. v. Town of Laurinburg, supra; Victoria Lumber Co. v. Wells, 139 La. 500, 71 So. 781; L. R. A. 1916E, 1110, Ann. Cas. 1917E, 1083.

In Atlantic Trust & Deposit Co. **v.** Town of Laurinburg, supra, the court, after quoting from United States Fidelity & Casualty Co. v. United States, added: "The very reason for the existence of this kind of corporations, and the strongest argument put forward by them for patronage, is that the embarrassment and hardship growing out of individual suretyship that give application for this rule [septissimi juris] is by them taken away; that it is their business to take risks and expect losses. If, with their superior means and facilities, they are to be permitted to take the risks, but avoid the losses, by the rule of strictissimi juris, we may expect the courts to be constantly engaged in hearing their technical objections to contracts prepared by themselves. It is right, therefore, to say to them that they must show injury done to them before they can ask to be relieved from contracts which they clamor to execute."

▉ If the departure was so great as to give rise to a new or additional contract, thereby increasing the liability of the surety, such departure might well be held to operate as a complete release of the surety. Cases cited by the defendant undoubtedly support this proposition, but the case at bar does not present a departure which substantially affects the character of the risk assumed by the defendant, and for that reason it is my opinion that it cannot be regarded as a valid defense to the plaintiff's action.

I therefore find and rule that the plaintiff is entitled to recover judgment in this action in the sum of $500,000, the penal sum of the bond.

During the course of the trial, plaintiff, over the objection of the defendant, sought to confine the issue solely to the question of liability, leaving the matter of damages for future determination. It then seemed to me that, upon the record before me, if there was liability, the court could very well determine the amount for which execution should be issued.

I find now, however, that in order to do so I will have to assume facts which are not yet in the record, but which probably

exist, and perhaps can be readily stipulated. The case may stand for further hearing on the amount for which execution may be awarded.