MINH TU, Plaintiff, Appellant,

v.

MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, Union Central Life Insurance Company, John Alden Life Insurance Company, Defendants, Appellees.

Nos. 97–1421, 97–1461 and 97–1473.

United States Court of Appeals,
First Circuit.

Heard Oct. 8, 1997.

Decided Feb. 13, 1998.

Owen Gallagher with whom Garrett Harris and Gallagher & Gallagher, P.C., Boston, MA, were on consolidated brief, for appellant.

Joseph H. Skerry III with whom Mark M. Owen and Lyne, Woodworth & Evarts LLP, Boston, MA, were on consolidated brief, for appellees.

Before BOUDIN, Circuit Judge, GODBOLD * and CYR, Senior Circuit Judges.

BOUDIN, Circuit Judge.

This is an appeal by Minh Tu from a district court decision rejecting his claims and granting summary judgment to the defendants. His complaint sought to recover just over $3.9 million in life insurance issued by three different insurers on the life of Minh Tu's wife, Phuong Ly. Summary judgment was granted because the district court found insufficient admissible evidence of Phuong Ly's death to submit the case to a jury.

What follow are facts that are undisputed or represent Minh Tu's version of events. *Randlett v. Shalala,* 118 F.3d 857, 858 (1st Cir.1997). Minh Tu and his wife, together with their children, came to the United States from Vietnam in 1980 and settled in Boston. The couple engaged in various business ventures including a jewelry store and a hotel. In the early 1990's, Minh Tu and his wife were in financial difficulty and missed a number of mortgage, rent and tax payments.

In June 1984 and November 1985, Phuong Ly acquired life insurance policies from Mutual Life Insurance Company of New York and John Alden Life Insurance Company, respectively, with total death benefits of $375,000. However, the bulk of the insurance on her life was obtained in late 1991 and early 1992 when Union Central Life Insurance Company issued additional policies to her with benefits of $3.5 million. The premiums were very large, amounting to $60,000 to $80,000 per year; but Minh Tu later said that the Union Central policies were taken to accommodate the salesman and to help the family obtain commercial loans.

In late 1992, Minh Tu and Phuong Ly visited Vietnam to pursue opportunities to import beer to Vietnam. In January 1993, Phuong Ly traveled alone from Boston to Ho Chi Minh City. According to Minh Tu, the purpose for his wife's trip was to visit restaurants in Ho Chi Minh City to see if interest could be developed in the beer venture. Phuong Ly arrived in Ho Chi Minh City on January 13, 1993, and stayed at a hotel. She had a return ticket to the United States for February 7, 1993, and a three-month Vietnamese visa.

According to Minh Tu, Phuong Ly next traveled to an area of Vietnam close to the Cambodian border, arriving at a hotel in the town of Chau Doc at around 9 p.m. on January 25, 1993. Phuong Ly called Minh Tu from the hotel and told him that she was going to visit an important Buddhist shrine in the city and that she would then travel to Cambodia for a few days. Minh Tu says that the following morning, Phuong Ly left a carry-all at the hotel desk, announced that she was planning to travel to Cambodia for a few days and said that she was renting a car for that purpose. An hour later she left the hotel by herself.

Phuong Ly did not use her return ticket and has not been seen alive again. Minh Tu traveled several times to Vietnam, in February and March 1993, to find his wife. On the first trip, Minh Tu says that he was told by Vietnamese officials that his wife had been killed by bandits in Cambodia. On the second trip, according to Minh Tu, a Vietnamese police officer traveled into Cambodia and returned with a set of documents—hereafter referred to as the Cambodian documents—

---

* Of the Eleventh Circuit, sitting by designation.

which Tu brought back to the United States. Minh Tu also has produced his wife's damaged passport, saying that the Vietnamese returned it to him, but no admissible evidence explains where or how the passport was discovered.

The Cambodian documents, purporting to have been prepared by an investigator of a government security service in Cambodia (Captain Se Sa Roeun), included a report, a notice of death, and a certification. According to the report, a female body had been found by the local villagers on January 27, 1993, in the border area of Cambodia nearby the area of Vietnam from which Phuong Ly had allegedly made her final phone call. The documents said that the body had been cremated, and the death certificate identified Phuong Ly.

In April 1993, Minh Tu's son, Paul, submitted the Cambodian documents to the town clerk of Milton, Massachusetts, and requested a death certificate. The town clerk, who is the authorized registrar of deaths of town residents, recorded Phuong Ly's death and provided the certificate. Shortly thereafter, Minh Tu submitted claims to all three insurance companies, supported by the Milton death certificate, the Cambodian documents, a statement that Minh Tu said he had obtained from the hotel clerk in the border town, and a report of Minh Tu's own investigation.

In due course, the insurers sent an investigator to Vietnam and also asked the U.S. State Department to investigate the reported death. An official in the U.S. Embassy in Cambodia said that the so-called Cambodian documents did not comport with the usual practice for death reports in Cambodia and, further, that Captain Se Sa Roeun had told the embassy that he had never seen the corpse and was acting on the reports of local farmers. The U.S. official therefore refused to issue an official report of death outside the United States.

Ultimately, the insurers refused to make payments on the policies, and Minh Tu brought suit in the district court, for breach of the insurance contracts and also under Mass. Gen. L. c. 93A and c. 176D, which govern deceptive practices and insurance pol-

icies. After discovery, the insurance companies moved for summary judgment on the contract claims. On November 15, 1996, the district court ruled that the Milton death certificate and the Cambodian documents were not admissible evidence and granted summary judgment on the contract claims. Later an appealable judgment was entered in favor of defendants on all of Minh Tu's claims.

■ We review *de novo* the grant of summary judgment, drawing inferences in favor of the non-moving party. *See Sargent v. Tenaska, Inc.*, 108 F.3d 5, 6 (1st Cir.1997). Minh Tu's main argument is that the district court should have submitted to the jury the question whether his wife was dead. At the outset he offers two reasons why he thinks a jury trial was required without regard to the admissibility or strength of the factual evidence that he could offer at trial.

The first such short cut is his claim that he submitted "due proof" to the insurers. All of the contracts use language indicating that the claimant must submit "due proof" or some equivalent term in order to qualify for payment under the policy. The MONY contract, for example, refers to "[t]he proceeds payable to the beneficiary upon our receipt of due proof of the death of the Insured." Minh Tu points to a Massachusetts ruling that "due proof" need not rise to the level of admissible evidence, *Krantz v. John Hancock Mut. Life Ins. Co.*, 335 Mass. 703, 141 N.E.2d 719, 725 (1957).

■ Minh Tu may be correct in thinking that his submissions constitute "due proof," but misunderstands the consequences of such a submission. Due proof is "the proof furnished to the insurer [that] shows on the whole 'that the claim is of a class within the protection of the policy, so that *if* the proofs should be accepted as true the insurer reasonably might pay the claim.' " *Washington v. Metropolitan Life Ins. Co.*, 372 Mass. 714, 363 N.E.2d 683, 685 (1977) (emphasis added) (quoting in part *O'Neil v. Metropolitan Life Ins. Co.*, 300 Mass. 477, 15 N.E.2d, 809, 811 (1938)). In short, due proof satisfies a "preliminary requirement" of notice, *Krantz*, 141 N.E.2d at 723, but if the insurer denies

death, the claimant must prove it by admissible evidence. *Larsen v. Metropolitan Life Ins. Co.*, 289 Mass. 573, 194 N.E. 664, 665 (1935).

Minh Tu's second "short cut" to the jury presents a more difficult issue. Under Massachusetts law, a town clerk must record deaths "in his town," Mass. Gen. L. c. 46, § 1, and "may" file an out-of-state death certificate of a town domiciliary if satisfied of its sufficiency. *Id.* § 1C. Further, "[t]he record of the town clerk relative to a . . . death shall be prima facie evidence of the facts recorded. . . ." *Id.* § 19. Minh Tu offered a death certificate provided by the Milton town clerk and says that it entitled him to a trial on the issue.

■ In Massachusetts, as in a number of jurisdictions, a showing is often described as *prima facie* where, absent rebuttal or contradiction, the evidence either is sufficient to permit the jury to find the inferred fact or compels the jury to find the inferred fact. *Commonwealth v. Garabedian*, 399 Mass. 304, 503 N.E.2d 1290, 1293 (1987); *Commonwealth v. Pauley*, 368 Mass. 286, 331 N.E.2d 901, 904–05, *appeal dismissed*, 423 U.S. 887, 96 S.Ct. 181, 46 L.Ed.2d 119 (1975). Still more helpful to Minh Tu is the statement in one Massachusetts case that, "[e]ven if contradicted, prima facie evidence is sufficient by itself to require submission of a case to the jury." *Todino v. Arbella Mut. Ins. Co.*, 415 Mass. 298, 612 N.E.2d 1181, 1183 (1993) (citing *Anderson's Case*, 373 Mass. 813, 370 N.E.2d 692 (1977)).

We will assume, *arguendo*, that the Massachusetts statute giving *prima facie* effect to a "record of a town clerk" relative to death embraces files or certificates made by the clerk concerning out-of-state deaths; one could argue that the *prima facie* effect is intended only for a record relating to deaths within Massachusetts, but no direct precedent resolves the point. Similarly, we will also assume without deciding that the *prima facie* effect statute governs in this diversity case. *See* Wright, *Federal Courts* § 93, at 665–66 (5th ed.1994).

Nevertheless, the Milton death certificate in this case is nothing but a proxy for the Cambodian documents; those were the principal papers presented to the town clerk, who made no independent investigation of the facts of the death. And, for reasons explained below, the Cambodian documents are not admissible evidence at trial. Since the Milton town record is simply the Cambodian documents in disguise, its admission would frustrate federal restrictions on the latter's admissibility; and it would grossly mislead the jury to admit the Milton record as if it were some ordinarily reliable official determination of death.

We do not think that the state legislature intended the statute, or that the Massachusetts courts would interpret it, to require judges to perpetrate a fraud on the jurors. It makes no difference whether we treat this result as an implied exception to the Massachusetts statute or rely upon limitations reflected in Fed.R.Evid. 401, 403 and 901—concepts also applicable under Massachusetts law. Happily, what seems to us common sense is also amply supported by precedent dealing with similar statutes in like circumstances, *e.g., Charleston National Bank v. Hennessy*, 404 F.2d 539, 540–42 (5th Cir. 1968).[1]

We come now to the central question: whether Minh Tu, as the party bearing the burden of proof, pointed to enough admissible evidence to permit a jury to decide the issue in his favor. This required Minh Tu to identify such evidence, whether through depositions, answers to interrogatories, admissions on file, or (most often) affidavits "made on personal knowledge [which] set forth such facts as would be admissible in evidence and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(c), (e).

The most direct evidence of Phuong Ly's death, if admissible, are the so-called Cambodian documents, all signed by Captain Se Sa

---

1. *See also New England Trust Co. v. Farr*, 57 F.2d 103, 110–11 (1st Cir.), *cert. denied*, 287 U.S. 612, 53 S.Ct. 14, 77 L.Ed. 532 (1932); *Pollard v. Metropolitan Life Ins. Co.*, 598 F.2d 1284, 1285– 87 (3d Cir.) *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 171 (1979). *See generally* 19 Rhodes, *Couch on Insurance 2d* § 79:263, at 207 (rev. ed.1983).

Roeun, who allegedly investigated the discovery of a corpse in Cambodia during the pertinent time frame. One document purports to be a report indicating the discovery of the body; the second, entitled "affidavit," states that Phuong Ly has died and identifies her as the holder of a passport with a specific number; and the third is a death certificate providing similar information. The first document purports to have been prepared on the day that the body was found, and the other two in March 1993.

The district court found that these documents were not authenticated by independent evidence showing that they were "what [their] proponent claims," namely, genuine documents signed by the Cambodian official in question, see Fed.R.Evid. 901(a); and the court found that the documents were not self-authenticating under Fed.R.Evid. 902(3).[2] Alternatively, the district court said that the Cambodian documents reflected what Captain Se Sa Roeun had been told by third parties about the death, and Minh Tu had pointed to no pertinent exception to the hearsay rule that would make those third-party statements admissible.

In this court Minh Tu does not even attempt to show that the documents were properly authenticated or that the statements within them as to the discovery of the body come within a hearsay exception. Instead, Minh Tu fruitlessly describes the documents and the facts asserted in them as if they were evidence which the jury would be entitled to consider. He does claim that the exclusion of this evidence was inconsistent with an earlier ruling of the district court, but we find no such inconsistency.

Limiting ourselves to evidence complying with Rule 56 and made known to the district court at the time of the summary judgment motion, Minh Tu could probably have offered admissible evidence to the jury to support the following: that his wife had gone to a village near the Cambodian border, that she had there declared her intention to visit

Cambodia, and that she had not been heard from since. An out-of-court statement by Phuong Ly as to her intent is, of course, hearsay, but it is within the mental state exception and permits the further inference that she acted in accordance with her intent. See Fed.R.Evid. 803(3); United States v. Brown, 490 F.2d 758, 762 (D.C.Cir.1973) (citing Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 295, 12 S.Ct. 909, 912, 36 L.Ed. 706 (1892)).

The argument is not without some force. If we knew only that Phuong Ly had actually gone to a dangerous area of Cambodia and had not been heard from again, the case might look like familiar cases allowing an inference of death where the insured set off into a dangerous wilderness and did not return. See e.g., Sargent v. Massachusetts Accident Co., 307 Mass. 246, 29 N.E.2d 825 (1940) (collecting cases). But these place of peril cases are at the edge of what is allowed before courts hold that the jury has passed the ill-marked boundary between reasonable inference and impermissible speculation. And Tu's facts are significantly weaker in other respects than the ordinary place of peril case.

First, we have no eyewitness evidence that Phuong Ly ever went to Cambodia; indeed, the main evidence that she had such an intention comes through Minh Tu, who is an interested party. While her intention is evidence of what she might well do, and Minh Tu was available to be cross-examined, the strength of the underlying inference—that she went to Cambodia and died there—declines to the extent that we lack assurance that the decedent ever was in peril.

Second, and to us more important, are other facts that Minh Tu does not dispute and which would have been part of the mix of circumstances before the jury: that the bulk of the insurance was taken out shortly before his wife's disappearance, that the family was in financial difficulty when it assumed huge premium burdens, that checks purportedly signed by Phuong Ly after February 1993

---

**2.** Rule 902(3) dispenses, for purposes of foreign public documents, with any requirement of extrinsic evidence of authenticity so long as certain steps are taken. One step involves obtaining a "final certification" from a U.S. government official attesting to the genuineness of the signature and official position of the local executing or attesting official. It is undisputed that no such certification was supplied here.

have been discovered,[3] that no good reason for the visit to Cambodia has been provided, and that the disappearance occurred in one of the few places in the world where effective investigation would be difficult and dangerous.

Some of the suspicion might have been dissipated at trial, depending on the weight given to Minh Tu's explanations for various discrepancies. But the place of peril inference is itself a stretch, even in the ordinary case. When doubts are greatly multiplied by doubts whether the insured was ever in peril and by a host of suspicious circumstances, we think that the overall likelihood that the death occurred has fallen enough so that it is impermissible guesswork for the jury to decide to make an award. *Cf. Jones v. United States,* 266 F.2d 654, 655 (5th Cir.1959); *Browne v. New York Life Ins. Co.,* 57 F.2d 62, 62–64 (8th Cir.1932).

█ Following the district court's grant of summary judgment, Minh Tu made a motion for reconsideration based on a number of newly obtained affidavits, and then, in a reply brief, added still further affidavits. These included a further affidavit from Captain Se Sa Roeun, an affidavit from a Cambodian lawyer and former hospital director that discussed local practice in dealing with the death of a foreigner, and affidavits relating to witness interviews of farmers in Cambodia. The district judge denied the motion for reconsideration, and we sustain his ruling.

█ Ordinarily, denial of a motion for reconsideration based on newly discovered evidence is tested under an abuse of discretion standard. *Mackin v. City of Boston,* 969 F.2d 1273, 1279 (1st Cir.1992), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993). Here, there is no showing that the information could not have been obtained through the use of due diligence before the summary judgment motions. Minh Tu never asked for more time to collect evidence prior to opposing the summary judgment motions. *See Parrilla–Lopez v. United States,* 841

F.2d 16, 19 (1st Cir.1988); *Washington v. Patlis,* 916 F.2d 1036, 1038 (5th Cir.1990).

In addition, despite the proliferation of affidavits, the only evidence that is close to mattering suggests that there were two witnesses who found a female body in the pertinent area of Cambodia during the time period in question. The witnesses offered nothing to identify the body as that of Phuong Ly. This is scarcely the kind of overwhelming proof that might make a denial of reconsideration a miscarriage of justice.

*Affirmed.*

---

3. The insurers discovered numerous checks, dated February 1993 through October 1993, bearing Phuong Ly's signature and payable in a few cases to Phuong Ly herself. Minh Tu and other family members said that they had signed Phuong Ly's name themselves and said that expert handwriting evidence would support this position.