# United States Court of Appeals

## For the First Circuit

No. 08-1766

UNITED STATES OF AMERICA,

Appellee,

v.

VICTOR DIAZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Gajarsa* and Lipez, Circuit Judges.

Martin J. Vogelbaum, Federal Defender Office, for appellant.
    Randall E. Kromm, Assistant United States Attorney, with whom
Michael K. Loucks, Acting United States Attorney, was on brief, for
appellee.

March 3, 2010

_____
    *Of the Federal Circuit, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**. Appellant Victor Diaz was found guilty of conspiring to engage in the sexual trafficking of children based on his involvement in a prostitution business, operated by his niece, that employed several minors. <u>See</u> 18 U.S.C §§ 371, 1591. On appeal, he asserts that his right to a fair trial was compromised by the district court's failure to investigate an incident of premature jury deliberations. He also claims that the court improperly admitted two sets of hearsay statements: (1) comments made by two minors during the course of prostitution calls that had been set up by police officers in Boston and Cambridge, and (2) statements made by his niece during the Cambridge sting operation.

We conclude that the district court did not abuse its discretion in the handling of the jury deliberation issue and that all of the statements were either properly admitted or harmless. We therefore affirm appellant's conviction.

### I.

A federal grand jury returned a six-count indictment charging Diaz and his niece, Evelyn Diaz,[1] with conspiracy to engage in the sexual trafficking of children, in violation of 18 U.S.C. §§ 371 and 1591. Evelyn pled guilty to the conspiracy charge and the other five counts, which alleged substantive sex

---

[1] To avoid confusion, we refer to Evelyn Diaz by her first name throughout the remainder of the opinion.

trafficking offenses that did not involve Diaz.  A jury found Diaz guilty of the conspiracy charge after a four-day trial.[2]

The facts underlying the charge, as the jury could have found them, are as follows.  Evelyn operated a prostitution business in the Boston area from at least 2003 through the time of Diaz's arrest in April 2005.  Evelyn, who sometimes used the name "Messiah," advertised her business as an escort service in various publications and online, including on Craigslist, under the name "Messiah's Adult Entertainment."  Her group of prostitutes included her two teenage sisters, "C" and "P," who were both under age eighteen.

Diaz knew that Evelyn ran a prostitution business whose employees included minors.  In 2001, he had urged his girlfriend, Evalicia Torres, who was then fourteen years old, to stay away from Evelyn because she was reputed to be a prostitute.  Torres, however, moved in with Evelyn and two other women in July 2004, when she was still a minor, and began working as a prostitute for her.  The women would entertain customers at the house where they lived, at customers' homes or in hotels.

Law enforcement officers investigating prostitution activities set up sting operations in March and April 2005, first in Cambridge and then in Boston.  On March 25, Cambridge police

---

[2] Diaz was sentenced to a term of imprisonment of fifty-one months and twenty-four months of supervised release.

officers occupied two adjoining rooms in a Cambridge hotel, one for the undercover activity and one for surveillance. From the undercover room, Detective Louis Cherubino called a phone number listed on one of Evelyn's Craigslist ads and asked for a girl pictured in the ad who was identified as "Jenna." A short time later, a girl who said she was "Jenna" returned the call and made plans to meet Cherubino at the hotel. Evelyn drove to the hotel with her sister, C, who entered Cherubino's room and asked him for $175. When asked what he would get in return, C replied "a full service." C handed Cherubino a condom and said, "Put it on, you won't be disappointed." The officers from the adjoining surveillance room then entered, arrested C and took her into the surveillance room. At the officers' direction, C called Evelyn and asked her to come up to the room. Upon entering, Evelyn told C to "shut up." Evelyn was read her <u>Miranda</u> rights, after which she told the officers that C was eighteen years old and that Evelyn drove her to various locations to give massages.

The second sting operation occurred on April 14 at a Boston hotel, where officers again took two adjoining rooms.[3] Detective Steven Blair called a telephone number listed in one of Evelyn's Craigslist ads and asked for "two girls," specifying that "they have to be young." The person on the other end, apparently

___

[3] Evelyn was apparently out on bail following the first arrest.

a woman, said "we can help you out," and gave Blair a price. A short time later, Blair received a call from a man telling him that the girls were "on their way."

An officer conducting surveillance outside the hotel, Sergeant Paul Mahoney, subsequently saw a red Jeep pull up in front of the hotel to drop off two females. The Jeep's driver, appellant Diaz, drove the car to a parking lot behind the hotel. About twenty minutes after the second phone conversation, two women knocked on Blair's door and entered the hotel room. The older one appeared to be eighteen to twenty years old and the younger one between thirteen and fifteen. The younger one, Evelyn's sister P, placed a call on her cell phone and told the man on the other end that "[w]e're in."[4]

A conversation ensued about the services to be provided and their cost. The older woman, Chavonne Lewis, stated that she would provide "straight oral and masturbation" for $300. When Blair asked if both women would do this, P stated, "I don't fuck. I'll jerk you off." After Blair gave Lewis the $300, P said, "[g]ive me the money, give me the money. I'll run it downstairs." The officers in the adjoining room then entered, and Mahoney was instructed to arrest the driver of the red Jeep. In a search of the vehicle, Mahoney found, inter alia, cell phones, a business

---

[4] Blair testified that he knew the person P called was male because he could hear the person's voice on the phone.

card with the word "Messiah" and escort information, including phone numbers, and a pink bag that contained condoms, among other items.

Diaz was arrested and, after signing a waiver of his Miranda rights, admitted in an interview with FBI Agent Tamara Harty and Sergeant Detective Kelly O'Connell of the Boston Police Department that he had driven P and Lewis to the hotel at Evelyn's request. Harty, who had begun investigating Evelyn's escort service about ten months earlier, testified that Diaz said that Evelyn expected him to let her know when the prostitution call was completed. He also admitted to driving females who worked for Evelyn to prostitution calls on other occasions, including P, whom he knew was thirteen years old. He said he was not paid for his help, but drove the girls as a favor to Evelyn.

In his own testimony at trial, Diaz denied driving P to prostitution calls or telling Agent Harty that he had done so. He claimed that he did not know that C was involved in prostitution until the March sting operation and did not know that P was involved before his arrest. Diaz admitted driving the two women to the hotel at Evelyn's request. He had expected, however, to pick up only Lewis and said that P explained that she was going into the hotel with Lewis so that Lewis would not be alone. He also said he was not planning to pick up the women after the call, but pulled

into the parking lot so that he could watch a wrestling match on the television in the car.

Diaz further explained that he had agreed to drive Lewis at Evelyn's request because she threatened not to let him use her car again. He had no car and relied on Evelyn to provide him with a vehicle to visit his friends, go job hunting, help his mother and see his daughter. He acknowledged regularly driving P and other women working for Evelyn, but only on trips to visit friends or go shopping.

## II.

Appellant contends that the district court committed reversible error in failing to investigate whether a juror note given to the court about ninety minutes after the start of testimony showed that the jury had engaged in premature deliberations. We first describe in some detail the parties' discussions with the court concerning the note and then consider the court's response.

### A. The Note and the Court's Colloquy with Counsel

The juror note was given to the court during a mid-morning break in the cross-examination of the government's first witness, Evalicia Torres. Although the note and its exact wording are not in the record, the court reported that it asked about "the meaning of conspiracy and what the government has to prove beyond

a reasonable doubt."[5]  The record indicates that the note was signed by a single juror, but it referred to "our question." Before Torres's cross-examination resumed, the court gave counsel the opportunity to see the note, and then advised them that it would respond by telling the jury "it's a legal question that I'll address at the end in the instructions."  Neither party objected, and the court then spoke to the jury as follows:

> One juror sent me a question about the meaning of conspiracy and what the government has to prove beyond a reasonable doubt.  I will be addressing all of those issues in detail during my final instructions of law, so I will not be discussing it right now.  We'll continue with the cross.  But if you want to ask questions, that was the right mode to do it, and, as I said, I'll address that later on.

The trial continued for about another ninety minutes, and the jurors were then excused for the day.  The next morning, defense counsel returned to the subject of the note.  She observed that "the note is some evidence perhaps of premature deliberations on the part of the jury," pointing out that the last line of the note referred to "our question."  She urged the court to question the juror "to determine the context in which this note came to be written."  She explained that, if the note resulted from a group discussion, "that would appear on its face anyway to be a violation of the Court's instructions not to [discuss the case]" and the jury

---

[5] The note was marked to be included in the record, but it was not preserved.

-8-

would "at least need[] to be admonished, [and] if it's gone farther than that . . . there may be some other action."

Counsel also commented that it was "very troubling" that the note was written so early in the case: "I'm very concerned that the jury is prejudging the case already and trying to figure out what the verdict should be halfway through the testimony of the first witness." Inquiry into the circumstances was warranted, she stated, because it was difficult to know how to respond "in a vacuum of knowledge." Rather than an individual voir dire, which the government argued was unnecessary, counsel suggested that the court could question the jurors as a group, without the lawyers present, to be sure they were not "reaching some factual conclusions."

The court acknowledged that the defendant's concern was "very well taken," but it adopted the government's view that an admonishment to the jury not to talk about the case and to disregard any prior deliberations would be sufficient in the circumstances. The court observed that, even assuming "the worst case" – that the jurors discussed the meaning of "knowingly" – "there's no remedy . . . other than what I'm about to do, which is tell them not to do it again." The court also noted that everyone had agreed with the court's decision the day before to tell the jury it would instruct on the law later in the trial, and it expressed a "reluctan[ce] to backtrack." It noted that the jurors

could not have discussed the facts very much in any event because the trial was "only . . . an hour into the first witness."

Thus, when the jury returned, the court gave the following instruction:

> We reread a question that came in from one juror yesterday after we got out, and there was some concern there, and I wanted to just reiterate something. You cannot discuss this case in the jury room either. No one should be deliberating now. And one word there struck our attention. There can't be any questions from the jury yet because you haven't started deliberating yet, and you can't start deliberating. So at this point, if some individual juror wants to ask a question, that's fine; but as a jury, no one should be talking about the case. It's a flat ban. And you might wonder why because you'll just be talking about it in a day or two. It's because you haven't heard everything. You haven't heard all the witnesses, and you haven't heard all the legal instructions, and that's why we want you not to be talking about it in the jury room. So to the extent that there was any lack of clarity before, I'm making it crystal clear now, when you go back for the break or you go back afterwards or tomorrow morning as you're coming in, no one can talk about the case until I send the verdict to you and give you the instructions.

No objections followed the instruction.

## B. The Adequacy of the Court's Response

### 1. Standard of Review

When a defendant has timely objected to the district court's handling of a claim of premature deliberation, we review the court's response for abuse of discretion. United States v. Mikutowicz, 365 F.3d 65, 74 (1st Cir. 2004). Because trial judges

enjoy broad discretion in addressing potential juror misconduct, we "normally . . . will not reverse unless the judge's choice among the various avenues available was patently unreasonable." United States v. Lemmerer, 277 F.3d 579, 591 (1st Cir. 2002). Indeed, we have held that the court's discretion is "at its broadest" when it responds to an allegation of premature jury deliberations. Mikutowicz, 365 F.3d at 74; see also United States v. Dominguez, 226 F.3d 1235, 1246 (11th Cir. 2000) (noting "broadest" discretion "when the allegation involves internal misconduct such as premature deliberations").

The government argues that an even higher hurdle – plain error review – applies to this case because Diaz did not object to the court's original response to the note or to its instruction the next day. The government also contends that, because Diaz never moved for a mistrial based on the jury's conduct, he may not now claim entitlement to a new trial.

In response, Diaz asserts that his claim was fully preserved by his request on the second day of trial that the district court probe the possibility of improper jury deliberations. He argues that his "delayed objection did not impair the court's ability to craft a solution," noting that the court could have at that point excused any jurors who had formed an opinion about guilt or innocence. He further emphasizes that the court expressly rejected the possibility of a mistrial, making it

-11-

futile for him to move for a mistrial or to object to the second jury instruction.

We need not rule on the timeliness of Diaz's objection because, even under the more favorable abuse of discretion standard, his claim of reversible error is unavailing. With respect to timing, we note only that, while Diaz's counsel was slow to register an objection to the district court's original approach, the court acknowledged that some remedy was still appropriate and useful when the issue was raised on the second morning of the trial. See United States v. Carpenter, 494 F.3d 13, 21 (1st Cir. 2007) (noting that "[t]he preservation requirement" is designed to alert the trial judge to a party's objection to a ruling, with adequate explanation, so the judge "can decide what course of action to take to assure, so far as possible, the legal correctness of the trial proceedings"). For present purposes, we can assume for convenience that the abuse of discretion standard applies.

2. Analysis

Trial courts employ a multi-step framework in assessing claims of juror misconduct, including premature deliberations. See, e.g., United States v. Tejada, 481 F.3d 44, 52 (1st Cir. 2007); Mikotowicz, 365 F.3d at 74. The court first must ascertain whether the allegation is colorable. Mikotowicz, 365 F.3d at 74. If it is, the court must investigate to "assess[] the magnitude and extent of any prejudice caused" and, where necessary, it must

-12-

consider prophylactic measures to alleviate the prejudice.  <u>Tejada</u>, 481 F.3d at 52.  If no curative measures appear adequate, the court may grant a timely motion for mistrial.  <u>Id.</u>

The district court in this case rejected the defendant's claim at the threshold, refusing to probe the possibility that the jurors had engaged in premature deliberations, and instead relied on its firm instruction reminding the jurors of its earlier admonition against discussing the case before all of the evidence was presented.  We cannot fault the court for that measured course of action.  Just the day before the note was received, after the jurors were sworn, they had been told not to discuss the case until after they heard all of the testimony.[6]  The note barely intimated that the jurors had violated that prohibition at all, let alone engaged in inappropriate deliberation.  Although the use of the pronoun "our" suggested a conversation among at least two jurors, the note requested clarification only of a legal principle and gave

---

[6] The court told the jury:

Now, a few words about your conduct as jurors.  You cannot talk about this case with anyone. . . . You cannot talk to anyone about the case now.  Once the case is concluded, you can talk about it with whoever you want to, but for now you can't.  You can't even talk about it in the jury room, and I say that because what we don't want is the first three jurors deciding the case after the first witness and then the next three after the next one.  It's important for you to hear all of the witnesses and my instructions of law before you form an opinion as to the appropriate outcome of this case.

-13-

no indication that the jurors had discussed the merits of the case against the defendant.

In addition to the content of the note itself, the fact that the trial had been underway for less than ninety minutes diminishes the likelihood that the conversation that apparently took place constituted inappropriate deliberations about the facts of the case as then presented, or the defendant's guilt or innocence. Conversations between jurors concerning the case they are hearing do not always amount to premature deliberations. See United States v. Peterson, 385 F.3d 127, 135 (2d Cir. 2004) ("Not every comment a juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition of deliberation."); Mikutowicz, 365 F.3d at 75 (finding no duty to investigate where juror expressed doubt about her ability to determine guilt because that conversation was "a far cry from a conversation in which the jurors discussed the merits of the parties' positions"). Indeed, the district court observed that, "[t]ruthfully, the way [the jurors] phrased [their question] and the way the law is going to go, their focusing on that is exactly the right issue."

Diaz's counsel responded that she was "not necessarily disagreeing" with the court's assessment, but pointed out that, if asked, the jurors might say "they were actually reaching some factual conclusions." The court deemed this hypothetical

-14-

possibility of juror misconduct an insufficient basis to justify further inquiry, but it did not simply dismiss the defendant's concerns. Rather, the court provided a remedy in the form of an emphatic reminder that the jurors should not talk about the case. Particularly given the ambiguous content of the note, the court's handling of the situation was sensible and appropriate, and well within the bounds of its broad discretion.[7]

## III.

Diaz argues that the district court improperly allowed the admission into evidence of seven out-of-court statements made by Evelyn's teenage sisters, as well as two statements made by Evelyn herself at the time of her arrest at the Cambridge hotel.[8] He contends that these statements were all inadmissible hearsay. Alternatively, he asserts that the statements should have been

---

[7] In his reply brief, Diaz suggests that the district court was acting under the misconception that, even if further investigation revealed that the jurors had engaged in premature deliberations, the only remedy would be a curative instruction. He points to the court's observation that, "there's no remedy even if they did talk about it . . . , other than what I'm about to do, which is tell them not to do it again."
Whatever the court's understanding of the range of available remedies, it is apparent that the court viewed the circumstances in this case to present only a slight possibility of improper deliberations, for which a curative instruction was a sufficient remedy. As we have explained, that judgment is supportable.

[8] Two of these seven "statements" consist of multiple sentences that the parties grouped together for purposes of discussion.

-15-

excluded because they were irrelevant and more prejudicial than probative.

District court rulings on the admission and exclusion of evidence are reviewed for abuse of discretion. <u>United States</u> v. <u>Rodríguez-Berríos</u>, 573 F.3d 55, 60 (1st Cir. 2009); <u>see</u> <u>also</u> <u>United States</u> v. <u>Colón-Díaz</u>, 521 F.3d 29, 33 (1st Cir. 2008) (noting that the abuse of discretion standard ordinarily applies to rulings on "whether to admit evidence over a hearsay objection").

## A. The Teenagers' Statements

The government introduced four statements made by C through the testimony of Cambridge Detective Cherubino and three statements made by P through the testimony of Boston Detective Blair. Two of the statements related to setting up the Cambridge prostitution call. Although the speaker was not identified at the time these statements were made, Diaz attributes both of them to C and the record reflects general agreement as to that assumption. The first such statement was made by the person who answered the phone at the escort service when Cherubino called from the Cambridge hotel to set up a rendezvous there, and the second was made by the person who called him back a short time later. They were:

> ". . . she told me that she would return a call within five minutes."

> "And there was discussion of the price for a half hour for $175 for full service, and I

-16-

agreed, and I was told that she would respond within a half hour to my location."

C's other two statements were made in the hotel room. According to Cherubino:

"[S]he told me that she wanted to take care of the financial obligation and asked me for the $175 . . . ."

"I asked the female what I would get for this fee, and she replied "'a full service.'" She also remarked upon handing Cherubino a condom: "'Put it on. You won't be disappointed.'"

P's three challenged statements, which all occurred in the Boston hotel room where she and Lewis met Detective Blair, were:

Her report to a male on the other end of a phone call that "'[w]e're in.'"

Her statement to Blair that "'I don't fuck. I'll jerk you off.'"

Her statement to Lewis, "'Give me the money, give me the money. I'll run it downstairs.'"

The district court admitted the first six statements on the basis that they were non-hearsay directions whose truth or falsity was immaterial. It allowed the final statement into evidence for the limited purpose of showing P's state of mind. We briefly address the group of six before considering the court's treatment of the final statement.

1. The Six "Non-Hearsay" Statements

The government acknowledges that certain of the statements admitted by the district court as non-hearsay probably should not be classified as instructions or requests that

-17-

categorically fall outside the hearsay rule. It nonetheless argues that such statements were properly admitted as non-hearsay because they constitute "verbal acts" or "verbal parts of acts" that evidenced the prostitution transactions. See, e.g., United States v. DeCologero, 530 F.3d 36, 59 (1st Cir. 2008); United States v. Murphy, 193 F.3d 1, 5 (1st Cir. 1999); 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.11[3]-[4], at 801-818-21 (Joseph M. McLaughlin, ed., 2d ed. 2009).[9]

We find it unnecessary to closely examine the propriety of allowing the six statements into evidence because we are persuaded that any error in their admission was harmless.[10] See United States v. Benitez-Avila, 570 F.3d 364, 372 (1st Cir. 2009) ("Improper admission of testimony is harmless if it is highly probable that the error did not influence the verdict.") (citation and internal quotation marks omitted). Although all six of the statements provided telling evidence about Evelyn's business, and the statements made by C and P in the hotel rooms confirmed that

---

[9] "Verbal acts" include statements whose utterance "gives rise to legal consequences," such as the words used by contracting parties in reaching an agreement or by individuals charged with making a threat, bribe or misrepresentation. 5 Weinstein's Federal Evidence § 801.11[3], at 801-18-20. The "verbal parts of actions" doctrine establishes that "utterances that help to clarify or define ambiguous conduct are not hearsay." Id. at § 801.11[4], at 801-21.

[10] Diaz concedes that he failed to object to the two statements made in phone calls with Cherubino. Admission of those statements would in any event be subject only to plain error review.

minors employed by her were engaging in prostitution, none of the statements implicated appellant Diaz in Evelyn's activities.[11] Moreover, Diaz does not dispute that Evelyn was involved in prostitution with her younger sisters and other minors, and there was substantial evidence about the sting operations, other than the challenged statements, that would have led the jury to find that prostitution was occurring on those occasions.

Nor do we find merit in Diaz's contention that the sexually graphic nature of the statements could have confused or misled the jurors, or provoked their disgust with him, thereby causing undue prejudice. As an initial matter, we note that Diaz never argued to the district court that the probative value of the statements was substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed. R. Evid. 403. We therefore would reverse the district court's ruling only for plain error – a standard that certainly was not met here. The jury heard other far more pertinent, explicit testimony linking Diaz to the prostitution scheme and Evelyn's exploitation of her sisters, including his admission to Agent Harty that P was among the girls he had driven to calls. We thus see no meaningful possibility that the distasteful nature of the statements

---

[11] The only one of the six suggestive of Diaz's complicity was P's statement "[w]e're in" because Blair could hear that she was reporting that information to a male. Even within that context, however, the statement did not point to Diaz.

contributed to the jurors' finding that Diaz was a knowing and willing participant in Evelyn's business.

2.  "I'll run it downstairs"

Diaz also contends that P's request for the money and her assertion that she would bring it downstairs was improperly admitted under a sub-category of the state-of-mind exception to the hearsay rule known as the Hillmon doctrine.  See Fed. R. Evid. 803(3) (describing the state-of-mind exception); Mut. Life Ins. Co. v. Hillmon, 145 U.S. 285 (1892); Minh Tu v. Mut. Life Ins. Co., 136 F.3d 77, 81 (1st Cir. 1998).[12]  That doctrine allows admission of a hearsay statement of intent for the purpose of showing that the declarant later acted in accordance with his or her expressed intention, see Minh Tu, 136 F.3d at 81, and some courts also have allowed such evidence to prove the actions of a third party, see 2 George E. Dix, et al., McCormick on Evidence § 275, at 275-76 (Kenneth S. Broun, ed., 6th ed. 2006).

We need not delve into the intricacies of the Hillmon doctrine here.  Although the court raised the doctrine during the

-----

[12] Rule 803 lists various exceptions to the hearsay rule, including subsection (3) as follows:

Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

final pretrial conference, it gave only a standard state-of-mind instruction when it ruled during trial that P's statement was admissible.[13]  Moreover, defense counsel objected to admission of the statement during the pretrial colloquy only on the ground that P's intent was not relevant and offered no additional explanations for the objection at trial.[14]  Any other contention regarding the statement's admissibility is therefore subject to plain error review.  See United States v. Dowdell, No. 08-1855, slip op. at 35 (1st Cir. Feb. 12, 2010).

---

[13] The court instructed the jury as follows:

Now, at this point, "I'll run it downstairs" I'm admitting only for what was in the state of mind of that younger woman when she said that, what was in her mind at that point, with that limiting instruction in mind.

[14] Before Detective Blair took the stand, the court had advised counsel that it would "give a limiting instruction as to [P's] state of mind."  The following exchange then took place:

DEFENSE COUNSEL: What is the limiting instruction the Court is planning to give?  I do object to it, and I want the record to reflect clearly that that should not be admissible against Mr. Diaz.
COURT: Yes, your objection is clear, and you should probably object again just to make sure it's clear for the record.  But I'll give a limiting instruction: "You're only to consider it as to what her intent is and her plan was."
DEFENSE COUNSEL: I will object.

During Blair's testimony about his conversation with the two girls, counsel objected repeatedly to "this entire line of questioning" and asked if the attorneys could "come up just so I can make sure that the record is clear about my objection on this."  The court denied the request, stating "No.  You've made it."  After Blair testified to the "I'll run it downstairs" statement, the court gave the instruction described in footnote 13.

The <u>Hillmon</u> claim and appellant's other contentions would be unavailing even under a less onerous standard,[15] however, because the statement's admission, if error at all, was harmless. P's intention to bring the money downstairs shows that she believed someone would be there to collect it from her, but her statement does not explicitly identify appellant as the expected recipient. Diaz argues that the statement was nonetheless prejudicial because it included an implied assertion that he was the individual to whom P expected to give the money. Even if such an implied assertion were subject to an appropriate hearsay objection (an issue we do not decide), the jury's finding of guilt would not be compromised. Diaz's willing participation in the Boston transaction, and thus the conspiracy, was more directly shown through other evidence – particularly that he had driven P and Lewis to the hotel, stayed in the area after the drop-off, and gave an odd reason for remaining. In addition, the government presented evidence that appellant had admitted knowingly driving females, including P, to prostitution calls. P's statement added only marginally to this evidence, and we have no doubt that the jury would have reached the same outcome without it.

**B. Evelyn's Statements**

---

[15] Diaz, inter alia, reiterates his claim that the statement should have been excluded as irrelevant.

The district court allowed the introduction of two statements that Evelyn made, as recounted by Detective Robert Ahern, after C summoned her to the Cambridge hotel room. Ahern testified that, when Evelyn first entered the room, she "looked at C--- and just told her to shut up." He also testified that Evelyn stated that "C was her sister, that she was eighteen years old, that she drove her sister around to give massages, but that was it."

The court admitted the statements over defendant's objection after the government argued that they were made in furtherance of the conspiracy and were thus admissible under Federal Rule of Evidence 801(d)(2)(E), which provides an exception to the hearsay rule for co-conspirator statements made during and in furtherance of a conspiracy. On appeal, Diaz reasserts his contention that the statements were not admissible on that basis. Although he acknowledges that they were made <u>during</u> the conspiracy, he argues that they were not made <u>in furtherance of</u> the conspiracy's objective – the sexual trafficking of minors – because the arrests of C and Evelyn already had foiled that objective. Diaz claims that the statements were made "solely for the purpose of concealing the thwarted illegal agreement," and were therefore inadmissible. See <u>Grunewald</u> v. <u>United States</u>, 353 U.S. 391, 401-03 (1957); <u>United States</u> v. <u>Serrano</u>, 870 F.2d 1, 8-9 (1st Cir. 1989).

The government argues that Diaz failed to preserve this claim because he did not ask the district court to make a Petrozziello determination, see United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), in which the court rules on whether it is more likely than not that the declarant and the defendant were members of a conspiracy and whether the challenged statement was in furtherance of that conspiracy. See Colón-Díaz, 521 F.3d at 36. Without such a request, and an objection to the court's ruling, review is only for plain error. Id.; see also United States v. Avilés-Colón, 536 F.3d 1, 13-14 (1st Cir. 2008) (noting that, "to properly preserve an objection to the admission of evidence under the co-conspirator hearsay exception, a defendant must ordinarily object both when the hearsay statements are provisionally admitted and again at the close of all the evidence") (citation and internal quotation marks omitted).

Diaz cannot show error, let alone plain error. He admits that the statements were made within the dates of the conspiracy charged in the indictment. The evidence allowed the district court to conclude that the conspiratorial conduct – involving minors in prostitution activity – did not end with the arrests in Cambridge. Indeed, Diaz testified that he transported Lewis and P to the Boston hotel, at Evelyn's request, a month later. The district court could properly find that Evelyn's statement directing C to stop talking, as well as her statements about C's age and the

-24-

services she was providing, were intended to prevent the law enforcement officers from putting her out of business – and thus to allow the conspiracy to continue operating.  See, e.g., United States v. Rodriguez, 525 F.3d 85, 101  (1st Cir. 2008) (holding that "[a] statement is in furtherance of the conspiracy if it tends to advance the objects of the conspiracy as opposed to thwarting its purpose") (citations and internal quotation marks omitted); United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985) (holding that a statement "fabricated to convince the [FBI] agent that the project should be allowed to continue . . . [is] made to further the object of the conspiracy").

Nor do we find merit in Diaz's assertion, raised for the first time on appeal, that the statements should have been excluded because they were unfairly prejudicial.  Evelyn's attempts to silence her sister and mislead the police officers were hardly shocking in the context of a case centered on the alleged sexual trafficking of minors.  Diaz was not present when the statements were made, and the jurors would have no reason to associate him with the comments except insofar as other evidence showed that he was complicit in Evelyn's prostitution activities.  Admission of the statements was not error.

Affirmed.